No 14672

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

THE MONTANA POWER COMPANY, A Montana Corporation,

Plaintiff and Appellant,

-vs-

LEO CREMER, JR., et al.,

Defendants and Respondents.

---

Appeal from:  District Court of the Sixth Judicial District,
Honorable Jack D. Shanstrom

Counsel of Record:

For Appellant:

Jardine, Stephenson, Blewett and Weaver, Great Falls,
Montana
Lon Holden argued, Great Falls, Montana

For Respondent:

Graybill, Ostrem, Warner and Crotty, Great Falls,
Montana
Gregory Warner argued, Great Falls, Montana
William R. Morse, Absarokee, Montana

For Amicus Curiae:

Donald McIntyre argued, Helena, Montana

---

Submitted:  May 4, 1979

Decided: JUN 22 1979

Filed: JUN 22 1979

*Thomas J. Kearney*

Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is an appeal by the Montana Power Company (MPC) from a judgment of the District Court of the Sixth Judicial District, sitting in Sweet Grass County, dismissing an eminent domain proceeding for lack of jurisdiction.

MPC brought a condemnation action to acquire a permanent easement across a strip of respondents' land for the construction of a six-inch gas transmission pipeline which in total would extend 38.3 miles from MPC's pipelines near Greycliff, Montana, to its Big Coulee field located southeast of Ryegate, Montana.

At the "necessity" hearing held on October 18, 1978, respondents objected to the taking of testimony on any need for the proposed pipeline alleging that the pipeline is a "facility" under the Montana Major Facility Siting Act and therefore the Department of Natural Resources and Conservation must first determine environmental compatibility and public need for the pipeline. Testimony was taken from John Robertson, MPC's gas and oil department manager and John Van Gelder, MPC's gas production and transmission manager.

Robertson testified that the proposed pipeline would connect MPC's total system of gas production, distribution and transportation facilities with its Big Coulee gas fields and that the general purpose of the connection was to replenish the depleted Big Coulee reserves for Lewistown, Montana, consumption. He stated that the estimated cost for construction of the pipeline was $1,693,000, and that it would be capable of transporting approximately 8,500 million cubic feet of gas per day.

On December 28, 1978, the condemnation suit was dismissed for lack of jurisdiction. The court found as a matter of law that MPC's proposed pipeline was a "facility" under the Siting Act since it led "from or to" a "facility" as defined by the Siting Act, section 75-20-104(7)(c) MCA, formerly section 70-803(3)(c), R.C.M. 1947. The court also found the pipeline to be an "addition to" MPC's present natural gas system. The court concluded that MPC was barred from conducting eminent domain proceedings because it had not obtained a certificate from the Montana Board of Natural Resources and Conservation.

MPC appeals from the District Court judgment dismissing the action for lack of jurisdiction and presents a question of statutory interpretation for review by this Court, viz.:

Whether the MPC's proposed gas transmission pipeline is a "facility" as defined by the Montana Major Facility Siting Act at section 75-20-104(7) MCA, formerly section 70-803(3), R.C.M. 1947?

The District Court found as a matter of law that MPC's pipeline is a facility under the Act because it led to or from a facility as defined by the Siting Act. The court designates MPC's "gas gathering", "transmission and distribution pipeline system" as a "facility" to which the proposed line would connect and therefore the line becomes a facility or associated facility. We disagree.

Both parties to this litigation have agreed that the intent of the legislature can be determined from the plain meaning of the words used in the statutes and it follows that the plain meaning rule controls. This leaves no necessity to examine legislative history. However, the parties have nonetheless been very generous in furnishing the Court

-3-

with claimed evidence of legislative intention. No one really got too close to Laws of Montana 1979, Chapter 527, which amended section 75-20-104 MCA, the statute under consideration here, and specifically excludes natural gas pipelines from the Siting Act. This bill was signed by the Governor and became effective immediately on April 10, 1979. This would seem to limit considerably the necessity for a long and involved discussion of the principles of statutory construction in this Opinion.

Additionally, the Montana Department of Natural Resources and Conservation appeared by brief and argued on behalf of the statutory construction urged by appellant. The Department has not considered gas transmission lines connecting other gas transmission lines leading to or from gas wells or fields as a facility under the Act. This Court has previously held that in statutory construction problems great deference must be shown to the interpretation given to the statute by the agency or officers charged with its administration. Department of Revenue v. Puget Sound Power and Light Co. (1978), ____ Mont. ____, 587 P.2d 1282, 1286, 35 St.Rep. 1368, 1372. This has more than usual import here as the dismissal below was based on the gas line being a "facility."

The development of the case law in Montana with respect to the rules of statutory construction may be summarized in the following analysis: (1) Is the interpretation consistent with the statute as a whole? (2) Does the interpretation reflect the intent of the legislature considering the plain language of the statute? (3) Is the interpretation reasonable so as to avoid absurd results? and (4) Has an agency charged with the administration of the statute placed

-4-

a construction on the statute? Dunphy v. Anaconda Co., (1968), 151 Mont. 76, 80, 438 P.2d 660, 662; Home Building & Loan Association v. Fulton (1962), 141 Mont. 113, 115, 375 P.2d 312, 313; Teamster Local #45 v. Cascade County School Dist. #1 (1973), 162 Mont. 277, 280, 511 P.2d 339, 341; State ex rel. Cashmore v. Anderson (1972), 160 Mont. 175, 184, 500 P.2d 921, 926-27; Puget Sound Power & Light Co., supra.

For the pipeline in question to fall within the parameters of the Siting Act, it must be a pipeline designed for or capable of transporting gas from or to a major facility. See section 75-20-104(7)(c) MCA, formerly section 70-803(3)(c), R.C.M. 1947, which states:

> "Each pipeline and associated facilities designed for or capable of transporting gas, water, or liquid hydrocarbon products from or to a facility located within or without this state of the size indicated in subsection (7)(a) of this section."

The facilities indicated in the referenced subsection include facilities capable of: (1) generating 50 megawatts of electricity; (2) producing 25 million cubic feet of gas per day; (3) producing 25,000 barrels of liquid hydrocarbon products per day; (4) enriching uranium minerals; (5) utilizing, refining or converting 500,000 tons of coal per year. For the gas pipeline to be a facility under the Siting Act, the pipeline must come from or go to one of these types of facilities.

Section 75-20-102 MCA, formerly section 70-802, R.C.M. 1947, establishes that the Siting Act is aimed at the "location, construction and operation of power and energy conversion facilities." Likewise, the facilities described in section 75-20-104(7)(a) MCA all clearly contemplate the siting and construction of artificial (man-made) facilities to aid in the conversion of a raw material to a commercial energy product.

Section 75-20-102(7)(a)(i) MCA concerns the generation of electricity. This section contemplates that the energy product, electricity, does not occur commercially in the natural state. Clearly, the Siting Act contemplates that artificial facilities will be constructed to convert a natural resource, such as coal or water, to an energy product such as electricity.

In a similar vein section 75-20-104(7)(a)(iii) recognizes that the production of liquid hydrocarbon products requires the involvement of a siting authority. The extraction or gathering of the liquid hydrocarbon product is not the determinative criterion. The determinative criterion is the production of an energy product through a conversion process. Under section 75-20-104(7)(a) MCA, oil and gas refineries are exempted from the Siting Act. Consequently, the Siting Act is concerned only with those facilities that are needed to convert a raw material, such as coal, to a liquid hydrocarbon product. Facilities that are needed to separate naturally occurring products which may be found together, such as crude oil and associated natural gas, and facilities which perform the mechanical action of extracting liquid hydrocarbon products from the earth are not within the scope of this definition.

Section 75-20-104(7)(a)(iv) MCA concerns the enriching of uranium minerals. It involves the conversion of the isotopic ratio of uranium to another isotopic ratio. Simply stated, the process involves the conversion of uranium in its natural state to an energy product form which is not commercially available in the natural state. As in the cases of the other facilities described above, the common thread linking the defined facilities together is the

-6-

production by artificial methods of an energy product through a conversion process.

Likewise, this common thread is found in section 75-20-104(7)(a)(v) which concerns the utilizing, refining or converting of coal. As in the above-described situations, a raw material, coal, is converted by artificial methods to an energy product in the form of heat, electricity, gas, hydrocarbon products or energy in any form for ultimate public use. It is the conversion of the raw material to a commercial product that is the subject of the Siting Act.

Therefore, if section 75-20-104(7)(a)(ii) is to be considered compatible with the remaining subsections of section 75-20-104(7)(a), as it must be in considering the statute as a whole, the gas producing facility must be limited to those types of facilities that convert naturally occurring material to an energy product. Gas wells and fields, as described in the District Court's order dismissing for lack of jurisdiction, are not the type of facilities that convert naturally occurring gas to an energy product. Rather, the facilities are gathering and transportation of a naturally occurring energy product. Such facilities are not subject to the requirements of the Siting Act.

As noted above, the Siting Act is clearly aimed at the "location, construction and operation of power and energy conversion facilities." The key phrase is "conversion facilities." Nowhere in the Siting Act is there express authorization for the State to site the mining or gathering activities of a potential applicant, except in those cases where the actual mining activity involves the conversion of the energy form. The extraction of natural gas and the ultimate transportation of the gas from its natural state to

-7-

the ultimate consumer does not involve a conversion process subject to the Siting Act. Although the gas may be sweetened, cleaned, pressurized or otherwise processed to make it suitable for burning, it is not converted to some other form by processing through any "power or energy conversion facility."

The judgment and order of the District Court is reversed and vacated, and this matter is remanded to the trial court with instructions to proceed expeditiously with the eminent domain proceedings.

_____
                      Justice

We concur:

_____
     Chief Justice

_____

_____
        Justices

Mr. Justice John C. Sheehy, deeming himself disqualified, did not participate.

No. 14672

MONTANA POWER COMPANY

vs.

LEO CREMER

---------------
D I S S E N T
---------------



FILED

JUN 2 9 1979

Thomas J. Kearney

CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea dissents:

I dissent because this natural gas pipeline plainly and properly comes within the definition of a "facility" under the Montana Major Facility Siting Act.

Section 70-803(3)(c), R.C.M. 1947, now section 75-20-104(7)(c) MCA provides:

"'Facility' means:

". . .

"(c) each pipeline and associated facilities designed for, or capable of, transporting gas, water, or liquid hydrocarbon products from or to a facility located within or without this state of the size indicated in subsection (3) (a) of this section; . . ."

Section 70-803(3)(a)(ii), R.C.M. 1947, now section 75-20-104(7)(a)(ii) MCA provides:

"'Facility' means:

"(a) each plant, unit, or other facility and associated facilities, except for oil and gas refineries,

". . .

"(ii) designed for, or capable of, producing twenty-five million (25,000,000) cubic feet of gas per day or more, or any addition thereto having an estimated cost in excess of two hundred fifty thousand dollars ($250,000), or . . ."

The question, then, is whether the pipeline to or from which the pipeline would lead is designed for or capable of "producing" 25 million cubic feet of gas per day or more. The Greycliff connection is tied in with MPC's total gas production system which is capable of producing approximately 290,000 million cubic feet of gas per day. Therefore, the proposed pipeline leads from or to a facility capable of producing in excess of 25 million cubic feet of gas per day.

Preliminarily, the majority opinion noted that section 70-20-104 MCA was recently amended so as to exclude natural gas pipelines from the Siting Act. This fact, according to

-2-

the opinion, "would seem to limit considerably the necessity for . . . statutory construction." In this case, we are concerned with the Act as it existed before the 1979 amendment. If anything, the amendment indicates that the legislature sought to change existing law (Tuttle v. Morrison-Knudsen Co. (1978), ____ Mont. _____, 580 P.2d 1379, 1382, 35 St.Rep. 864, 869; Montana Milk Control Bd. v. Community Creamery Co. (1961), 139 Mont. 523, 526, 366 P.2d 151, 152), and the change is effective only after the date of the amendment. Section 43-510, R.C.M. 1947, now section 1-2-203 MCA.

The opinion regards the fact that the Department has not considered gas lines connecting other gas lines to be "facilities" as deserving of "great deference". Dept. of Rev. v. Puget Sound Power and Light Co., supra. The cited case stated, but did not apply, this notion of statutory construction. However, Doe v. Colburg (1976), 171 Mont. 97, 100, 555 P.2d 753, 754 did, stating:

> "This Court has on several occasions considered the _interpretative_ _regulations_ _by_ _administrative_ _agencies_ charged with the duty of administering and enforcing a legislative act, for an understanding of the provisions that must be carried out. (Cites omitted.)
>
> "While such administrative interpretations are not binding on the courts, they are entitled to respectful consideration." (Emphasis added.)

Here, no interpretive rulings on the Department's treatment of pipeline-to-pipeline facilities exist. Surely, the Department's inaction cannot be viewed as the legal equivalent to the promulgation of an interpretive ruling.

The opinion then declares that Montana's rules of statutory construction may be summarized in a four-part analysis. This analysis neglects to mention the fundamental rule that legislative intent must first be determined from the plain meaning of the words used. Section 93-401-15, R.C.M. 1947, now section 1-2-101 MCA; Dunphy, supra; Teamsters

-3-

Local #45, supra; Cashmore, supra. Instead, the opinion reverses the inquiry and asks, "does the interpretation reflect the intent of the legislature considering the plain language of the statute?" In short, does our opinion find support in the statute?

Turning to the legislative policy statement in section 70-802, R.C.M. 1947, now section 75-20-102 MCA, the opinion seizes upon the "key phrase"--"conversion facilities"--as a statement of the Act's limited coverage. Even a cursory reading of the provision demonstrates that the legislative concern was not restricted to energy conversion facilities, but was generally aimed at furthering this State's policy of maintaining and improving "a clean and healthful environment . . . to protect the environmental life support system from degradation and prevent unreasonable depletion and degradation of natural resources." Section 70-802, supra. It is not inconsistent with this policy to impose siting requirements regulating the location, safety, construction and maintenance of gas pipelines. Indeed, the need for such legislation has prompted enactment of similar laws both by the United States Congress (49 U.S.C. §1671, et seq.) and by our sister states (See e.g., Wash.Rev.Code §80.50.010, et seq., and Or.Rev.Stat. §757.039.)

To bolster its decision the Court attempts to trace a "common thread linking the defined facilities together" and determines that the common denominator is the conversion process necessary to produce the other enumerated energy forms. It appears the Court went too far in its search for commonality. For example, in discussing the definition of liquid hydrocarbon producing facilities, section 75-20-104(7)(a)(iii), it is stated that only such facilities that convert a raw material, such as

-4-

coal, to a liquid hydrocarbon product are included. This totally unsolicited statement is not supported by the legislative history of section 75-20-104(7)(a)(iii). The 1975 Legislature specifically deleted any reference to gasification or liquefaction facilities for the obvious purpose of broadening the scope of the definition.

If there is a "common thread" linking the facilities subject to the siting requirements of the Act, it is simply the potential environmental impact posed by each of the enumerated facilities.

The District Court ruled correctly that the proposed gas pipeline is a "facility" and therefore subject to the requirements of the Major Facility Siting Act. Under the Act, the utility cannot conduct eminent domain proceedings until it has obtained a certificate of environmental compatibility and public need from the Department of Natural Resources and Conservation. Therefore, I would affirm the District Court order dismissing eminent domain proceedings.

Daniel J. Shea
Justice

-5-