Robert W. **MILLER** and Patricia M. Miller, Harold R. Miller and Bernice Miller, Plaintiffs-Appellees,

v.

The **FEDERAL LAND BANK OF SPOKANE**, Defendant-Appellant.

No. 76–1216.

United States Court of Appeals, Ninth Circuit.

Oct. 12, 1978.

Rehearing and Rehearing En Banc Denied Dec. 7, 1978.

George C. Dalthorp (argued), Crowley, Kilbourne, Huaghey, Hanson & Gallagher, Billings, Mont., for defendant-appellant.

William T. Kelly (argued), Kelly & Foley, Billings, Mont., for plaintiffs-appellees.

Before DUNIWAY and WRIGHT, Circuit Judges, and KUNZIG,* Judge, United States Court of Claims.

---

DUNIWAY, Circuit Judge:

In this civil action, jurisdiction rests upon diversity of citizenship. The plaintiffs (the Millers) are citizens and residents of Montana and the defendant is a federally chartered federal land bank having its principal office in Spokane, Washington.

The appeal is from a judgment in favor of the Millers, upon a verdict in their favor in a trial of certain issues to a jury, together with an earlier partial summary judgment.

I. *The Facts.*

The Millers were the owners of a 2,600 acre ranch in Treasure County, Montana. On June 5, 1966, they borrowed $47,800 from the defendant, the Federal Land Bank of Spokane (the Bank), at an interest rate of 5½%. As security for the loan, the Millers mortgaged the ranch to the Bank. The loan was payable in annual amortizing payments of $3,999.88, beginning on May 1, 1967, the last payment being due on May 1, 1986.

On August 28, 1972, the Burlington Northern Railroad (the Railroad) filed a condemnation action against the Millers, seeking to condemn a right of way easement for railroad purposes across 8 acres of the Millers' land. The action named the Millers and the Bank as defendants. Shortly thereafter, the Millers negotiated a settlement with the Railroad, in which the Railroad agreed to pay the Millers $31,400. The settlement check was issued on November 6, 1972, and was made payable to Robert W. Miller and Patricia M. Miller and the Bank. Attached to the check was a statement breaking down the payment made as follows:

Payment in full for land and damages in connection with the purchase of right of way . . .

| | |
|---|---:|
| Land | $ 4,708.00 |
| Damages | 26,692.00 |
| Total | $ 31,400.00 |

The Federal Land Bank Association of Billings, Montana, (the Association) acts as

---

* The Honorable Robert L. Kunzig, sitting by designation.

an agent for the Bank in negotiating loans and servicing loans to farmers under the federal statutes creating the federal land banks. See 12 U.S.C. former §§ 672 et seq. now §§ 2001 et seq. The federal land banks were created for the purpose of lending money at low interest to farmers. A farmer who wishes to borrow money from a federal land bank makes an application through the appropriate association and the association, after obtaining the necessary information, makes a recommendation to the bank that the loan be granted. If a loan is granted, the borrower must become a member of the association by buying its stock, and must pledge the stock to the bank as further security for the loan.

The Millers claim that, when they learned of the Railroad's desire for a right of way, they consulted with officers of the Association in Billings and were told by those officers that the Bank would demand only one-half of whatever part of the moneys obtained from the Railroad was allocated to the taking of the 8 + acres that the Railroad desired to acquire, and that the Millers could keep the other one-half of that amount, together with all moneys, if any, that were awarded as damages arising from the effect of the taking upon the remaining acreage of the ranch. The Millers therefore claimed, in the first count of their complaint, that they should only be required to pay to the Bank one-half of the $4,708.00, i. e., $2,354.00, which the attachment to the Railroad's check assigned to the value of the land taken.

They also assert that they were thereafter told by agents of the Association and the Bank that the Bank had taken the position that they would have to pay the Bank one-half of the total amount paid by the Railroad, that is, $15,700.00, or, if they did not do so, the Bank would not endorse the check and, consequently, the Millers could not cash it. The Millers allege that they told the Manager of the Association that they would pay one-half of the amount paid for the land, namely, $2,354.00.

In their complaint, filed March 7, 1973, which contains two counts, the Millers al-leged, in the first count, the foregoing claim and charged the Bank with fraud in demanding one-half of the total $31,400.00 settlement. They also alleged that the Bank demanded that they either pay one-half of the settlement or agree that they would enter into a new mortgage with a higher annual interest rate for the balance then due on the loan from the Bank. They claimed that they had been defrauded and that by reason of the fraud, they were entitled to $29,046.00 of the proceeds of the check, and to compensatory damages of $25,000.00, punitive damages of $75,000.00, interest on the $29,046.00 at the rate of 10% from November 10, 1972, the date of the settlement check, and other relief.

In their second count the Millers repeated the allegations of the first count and then alleged that the Bank was relying upon a provision in the mortgage (the eminent domain clause) which reads as follows:

If any of the mortgaged property shall be taken under right of eminent domain, the mortgagee [the Bank] shall be entitled at its option to receive all compensation for the portion taken and damages to the remaining portion, to be applied by the mortgagee upon the indebtedness hereby secured in such manner as it shall elect.

They alleged that this provision was "arbitrary, confiscatory, inequitable, invalid . . . without consideration, and would deprive the plaintiffs of property and liberty without due process of law." They asked for a judgment that the eminent domain clause was invalid and unenforceable. They further alleged that the clause has been waived by the Bank in some cases, has not been uniformly enforced against its mortgagors, and that by not enforcing it uniformly, the Bank has violated the provisions of the Act creating it, 12 U.S.C. former §§ 636–1012 now §§ 2001–2055. They concluded their second count by alleging that they were entitled to the entire $31,400.00, the principal amount of the settlement check.

Thereafter, each of the parties filed a motion for summary judgment, the Bank claiming that the clause above quoted is

valid and enforceable, that the Bank administered it uniformly, and that, independent of the clause, its policies, under which it claimed one-half of the total payment by the Railroad, were valid and uniformly applied.

The court denied the Bank's motion for summary judgment and granted that of the Millers. It rendered an opinion which is reported in *Miller v. Federal Land Bank*, D.Mont., 1974, 371 F.Supp. 1105. In that opinion, the court held, first, that the eminent domain clause did not apply because the land was not taken in a condemnation proceeding under the right of eminent domain, but was sold to the Railroad by the Millers in a compromise. Second, the court held that, assuming that the eminent domain clause applied to the case, it was void because its enforcement would shock the conscience of the court, particularly in light of the fact that, as the court said, the clause has not been uniformly enforced by the Bank. Accordingly, the court awarded the Millers a partial summary judgment which ordered the Bank to endorse the check mentioned above, free and clear of any claims on its behalf, so that the same could be cashed by the plaintiffs, and to pay the Millers interest on the sum of $31,400.00 from November 8, 1972, to April 22, 1974,[1] at 6%, together with costs of suit and attorneys' fees of $4,823.33. In that judgment it also ordered that the Bank recover nothing against the Millers.

Thereafter, the court held a jury trial on the charge of fraud in the first count which resulted in a verdict in favor of the Millers. The judgment entered on the verdict awarded the plaintiffs $3,500.00 compensatory damages and $20,000.00 punitive damages. It is from the final judgment and the partial summary judgment that this appeal is taken by the Bank.

II. *The Validity and Effect of the Eminent Domain Clause in the Mortgage.*

The trial judge, as we have seen, held both that the clause did not apply

under the facts of this case and that, if it did apply, it was invalid. We need not decide the latter question. We very much doubt that the clause, if applicable, is invalid. However, we do not decide the question because we agree with the trial judge that the clause does not apply to this case.

The clause deals with a situation in which a mortgaged property "shall be taken under the right of eminent domain" and the disposition of "all compensation for the portion taken and the damages to the remaining portion." Here, although the Railroad filed an action to condemn, the action was never tried, and never went to judgment. On the contrary, the Millers contracted with the Railroad to sell the right of way to the Railroad and to receive a certain amount of money in return. This is not literally the taking of property under the right of eminent domain nor compensation for such a taking. The clause was drafted by the Bank, and under well established principles it is to be construed against the Bank. Under these circumstances, we agree with the trial judge that the clause does not apply to this case, and we decide nothing about its validity if it did apply.

III. *The Bank's Policy Regarding the Proceeds of Partial Conveyances of Mortgaged Property.*

The record shows that from a time before the loan was made to the Millers and the mortgage was given to the Bank until the present, the Bank has had in effect certain policies regarding the disposition of proceeds of partial conveyances of mortgaged property. These policies are not limited to but do expressly apply to the proceeds of condemnation of a portion of the mortgaged land. The Bank contends that under these policies, it was proper to demand one-half of the recovery that the Millers agreed to with the Railroad. The court held that this too was unconscionable and that the Bank could not rely upon its policies both

---

1. On April 22, 1974, pursuant to an offer by the Bank, the Bank endorsed the check and the Millers were able to cash it. In an order authorizing this, the court reserved the Bank's right to recover all or part of the money from the Millers if the court's judgment were reversed.

for that reason and because, as the court said, the Bank had not uniformly applied those policies. With these views of the district court, we find ourselves in disagreement.

■ Under the laws of Montana, which is a "lien" state, a mortgage does not convey any title in the mortgaged lands to the mortgagee. It does create a lien, but the Supreme Court of Montana has held that in a condemnation action, the condemning body need not name the mortgagee as a defendant or bring the mortgagee into the case. *State ex rel. State Highway Commission v. District Court of Thirteenth Judicial District*, 1972, 160 Mont. 35, 499 P.2d 1228, 1235:

> Furthermore, in Montana it is established that a mortgage does not create an estate in real property but is mere security for payment of a debt or discharge of an obligation—it creates a lien upon the property. *Cornish v. Woolverton*, 32 Mont. 456, 81 P. 4; *Barth v. Ely*, 85 Mont. 310, 278 P. 1002. Therefore, Nichols on Eminent Domain, 3rd Ed. Vol. 2, § 5,741, states that in jurisdictions such as Montana:
>
> > " * * * in the absence of express statutory requirement, the mortgagee need not be made a party, or be notified of the proceedings, and he is not entitled to compensation from the condemnor."
>
> > * * * * * *
>
> We hold that it is unnecessary for the Commission to bring a quiet title action or name additional defendants.

The court held that the lien holder mortgagee could look only to the proceeds of the condemnation.

■ It is quite understandable that when the land was being sold, not condemned, the Railroad made its check payable to the Millers and the Bank. Only in this way could it avoid the possibility of liability to the Bank arising from paying over the amount of the settlement to the Millers without the consent of the Bank. A mortgage imposes a lien on all of the property mortgaged.

Thus the 8 + acres involved in the condemnation action and settlement were a part of the security for the Bank's loan.

■ "[A] mortgagee cannot be compelled to accept a part of his debt and release a corresponding part of the land, unless he has expressly agreed to do so . . . ." 59 C.J.S. Mortgages § 479, p. 757. We know of no law that would prevent the Bank from demanding a portion of the proceeds of a sale of a part of the mortgaged property as consideration for its willingness to release its lien upon the portion sold, at least provided that what it does is not truly unconscionable. We are unable to agree with the district judge that the Bank's stated policies or its administration of them, as disclosed by the record, are unconscionable.

The record shows without contradiction that at the time that the loan was made and the mortgage was given on June 6, 1966, interest rates were reasonably stable. At that time, the Bank's written policies, in effect since January 25, 1961, dealing with partial releases, read as follows:

GENERAL POLICY

> *Loans.* A partial release of the security for a loan . . . may be granted under any of the following conditions provided the credit factors are favorable.
>
> 1. Without any payment or other adjustment on the loan when
>
> (a) The remaining security is sufficient to support the balance of the loan on the basis prescribed for new loans and the interest rate on the loan is at least equal to the bank's minimum refunding rate applicable to the loan; . . . .

Shortly after, on July 1, 1966, subparagraph (a) of the policy was amended in part to read as follows:

> (a) The remaining security is sufficient to support the balance of the loan on the basis prescribed for new loans and the interest rate on the loan is 5½% or more; . . . .

There was another amendment on December 1, 1966:

(a) The remaining security is sufficient to support the balance of the loan on the basis prescribed for new loans and the interest rate on the loan is the rate currently being charged on new loans;

. . . .

On March 21, 1969, because of the changes in the money market, the policy statement was again changed, to provide for two different policies, one dealing with "Current Interest-Rate Loans" and the other dealing with "Less than current rate loans." The policy for current interest-rate loans was similar to that previously in effect for all loans. The new policy related to less than current rate loans:

*Less than current rate loans.* If the interest rate on the loan is less than the rate currently being charged on new loans, the granting of the partial release will be conditioned upon

(1) The payment of at least one-half of the present market value or sale price, including severance damages of the security to be released (whichever is higher) for application on the balance of the loan even though the remaining security is ample to support the remaining loan; . . . ; or

(2) The payment of an amount necessary to reduce the remaining loan to the maximum loanable and reamortizing the balance at the rate currently being charged on reamortized loans unless the loan is already written at this rate.

There was an exception for cases in which the sale price of the security to be released was nominal and inconsequential, meaning worth less than $2,000.00 or 10% of the loan balance, a provision not applicable in our case.

These provisions were again changed on April 9, 1969, but remained substantially the same where the loan involved was at an interest rate lower than 7%. The figure was raised from 7% to 8% on July 24, 1969, and this was continued in effect on December 16, 1969. This is the provision which was in effect when the settlement was made and the check of the Railroad was sent to the Bank.

██ We are unable to agree with the decision of the district judge that these policies are inequitable or unconscionable or shocking as applied in this case. The court relied upon an admission by the Bank that the sale of the 8 + acres would not impair its security and on the fact that the 8 + acres were less than 1% of the total acreage covered by the mortgage. We do not think that the record justifies summary judgment on such grounds.

The Bank put in evidence, as part of its response to the Millers' motion for summary judgment, a contract between Robert W. Miller and Patricia M. Miller, the principal plaintiffs, and one Wetsch, dated June 9, 1972, less than two months before the Railroad's action was filed, under which the Millers agreed to sell to Wetsch the property covered by the Bank's mortgage. The total purchase price was $89,500.00. The contract recited that the property was subject to a mortgage of $43,457.02, payable to the Bank in annual installments of $3,999.98, which Wetsch agreed to pay. Thus at that time the mortgage amounted to just under one-half of the total purchase price. The settlement with the Railroad assigned $4,708.00 to the 8 + acres and $26,692.00 as damage to the value of the remaining land. If this is an accurate measure of the value of the 8 + acres and of the damage to the remaining land, the demand by the Bank for one-half of the total settlement as a means of preventing impairment of its security is by no means unreasonable, much less either shocking or unconscionable.[2]

---

**2.** No doubt the amount of the settlement between the Railroad and the Millers was in part a result of a well known phenomenon: the value of ranch land grows instantaneously and enormously when a railroad seeks to condemn it. But surely, when the question before the court is market value, the price paid for land in a voluntary settlement is persuasive evidence of that value. The settlement indicates that between June 9, 1972, the date of the Miller-Wetsch contract, and the settlement check date, November 6, 1972, the value of the ranch had shrunk from $89,500 to $55,100. Thus the Bank's security was drastically reduced.

Moreover, even if the relative values were not as indicated above, (we mention them only because we think that they indicate that a summary judgment on the ground of unconscionability is not justified) we think that the policy of the Bank is a reasonable one. The Bank obtains money to lend to farmers by issuing short term bonds. It gets no money from the United States Treasury. It exists to provide long term loans to farmers, at interest as low as will permit it to remain solvent, with a reasonable margin of security. In a period of rising interest rates, when it has long-term low-interest loans outstanding, its ability to make new long-term loans at low-interest rates is necessarily impaired. It must pay higher and higher interest on its short-term bonds while continuing to collect low interest on its long-term loans, such as the Miller loan.

There is nothing in the law that requires the Bank to accede to a partial release of its lien when a portion of the property is sold by the borrower. We are unable to conclude that it is unreasonable, much less unconscionable, for the Bank to have a policy such as the one that it has, under which, where current interest rates are substantially higher than the interest rate on the outstanding loan, it demands, as consideration for a partial release from the mortgage, either that one-half of the proceeds of the sale be applied against the outstanding loan, or that the loan thereafter carry the same rate of interest that the Bank is then charging on newer loans.

■ In one sense the policy benefits the borrowers, in that the amount of the loan is reduced. The court refused the Bank's offer to prove that if one half the settlement, $15,700.00, were applied to the mortgage debt, the total amount of interest to be paid would have been reduced by $4,377.90, by reason of *reduction of principal and shortening of the amortization period.* This is a matter of mathematics, of which the court could and should have taken judicial notice. It is no small benefit to the mortgagors. In another sense, the borrowers can complain because, if they wish to keep the entire proceeds of the sale, they will have to pay a higher interest rate on the loan. This effect, however, is balanced by the enhanced ability of the Bank to make loans either to the borrower or to other farmers at a lower rate than that at which it would be able to make such loans if the policy in question were not in effect. For these reasons, we conclude that the Bank's policy, the existence of which is not contradicted, is, on its face, a valid policy.

■ The Bank is not an ordinary commercial enterprise. It is a body created by the Congress to carry out a defined policy. It is not the business of the courts to second guess the Bank's decisions as to how best to do it, so long as the Bank does not violate the terms of the statute that created it. *See Greene County National Farm Loan Association v. Federal Land Bank of Louisville,* 6 Cir., 1945, 152 F.2d 215, *cert. denied,* 328 U.S. 834, 66 S.Ct. 978, 90 L.Ed. 1610. As the court there pointed out, supervision of the Bank has been entrusted to the Farm Credit Administration, which in turn is under the supervision of the Secretary of Agriculture. It has not been entrusted to the federal courts. (152 F.2d at 220.)

There is conflict between the parties as to whether or not the Bank administered the policy in a fair and uniform manner. Under these circumstances it was improper to grant a summary judgment that the policy is invalid. More than that, we do not think that, absent a showing of irrational deviations from the policy, the policy can be held invalid because the Bank in particular cases relaxes it. This seems to us to be a perfectly reasonable thing for the Bank to do in the light of the facts of each particular situation that confronts it.

IV. *The Claim that the Bank Agreed to take One-Half of the Amount of the Settlement Attributed to the Value of the Land Taken.*

■ As we have seen, the Railroad's check assigns $4,708.00 to the value of the

land taken, and in the Millers' complaint they assert that two officers of the Association in Billings agreed to accept as the Bank's portion of any settlement one-half of the amount paid for the land taken and to waive whatever claim the Bank might have to any part of the amount assigned to damages to the remaining lands. The Bank does not admit that such an agreement was made but, in line with the views that we have expressed in part III above, we think that if such an agreement had been made in this case, it would be a reasonable agreement and one enforceable against the Bank.

The record indicates that borrowers customarily apply for loans through the local association. Indeed, they are required to do so and to become members themselves, and the loans are "serviced" by the associations. Under these circumstances, it appears to us that the Association had actual, or at least ostensible, authority to vary the policy in the case of the Miller loan. If, therefore, on a trial, the Millers can persuade a fact finder that the officers of the Association did agree, as the Millers claim, then the Bank can be held to that bargain, and it would be entitled to receive only $2,354.00 out of the settlement and the Millers would be entitled to the balance.

### V. *The Claim of Fraud.*

In submitting the Millers' claim based upon fraud to the jury, the trial court instructed the jury as follows:

> You are instructed that the Court has ruled in a prior proceeding that the defendant was not entitled to require that any of the proceeds of the sale of land to the Burlington Northern be applied against the mortgage debt. You are further instructed that the plaintiffs are entitled to damages for withholding of the sum of $31,400.00 from them during the period from November 8, 1972, through April 22, 1974. The measure of such damages is 6 per cent interest thereon during said period, or, in the alternative, such actual damages that you may find from the evidence herein that plaintiffs sustained proximately caused by the withholding of said funds.

In view of the conclusions that we have reached in part III of this opinion, it is obvious that a verdict based upon this instruction cannot stand.

In addition, we are compelled to conclude that the record does not support any claim that the plaintiffs had been defrauded. Plaintiffs' claim of fraud is succinctly stated in the court's instructions to the jury:

> First, that representatives of the Federal Land Bank Association of Billings represented to the plaintiffs that if plaintiffs wanted to make a settlement with Burlington Northern Inc. for the purpose of right of way access for a spur railroad track, that the Federal Land Bank would only require payment to it under its mortgage of one-half of the amount allocated for payment allocated for land conveyed to the Burlington Northern Inc. exclusive of the amount allocated to severance damages; second, that the representations were false; . . . seventh, that the plaintiffs relied upon the truth of the representations; . . . ninth, that the plaintiffs were consequently and proximately injured by their reliance upon the representations. . . .

The record shows that the only thing that the Millers can claim that they did in reliance upon the alleged misrepresentations by the officers of the Association was to make the settlement with the Railroad. There is no claim that the settlement was not a fair settlement. There is no claim that making the settlement damaged the Millers. The court properly rejected as speculative proffered testimony by one of the Millers that had it not been for what they were told by the representatives of the Association, they would have obtained a higher settlement. In short, the notion that the Millers were induced by the representations to take the settlement that they made, and that somehow they might have done something different but for the representations, is sheer speculation and not a basis upon which to say that the Millers relied upon the truth of the representations to

their detriment. The Millers are not repudiating the settlement.

 The only damages that the Millers suffered as a result of the Bank's failure to carry out the representations that the Millers say that they relied upon was a delay in their obtaining the money from the settlement. The normal measure of damage for the withholding of money is the legal rate of interest, (R.C.Mont.1947 §§ 17–303, 47–122; see also 22 Am.Jur.2d Damages, § 180, pp. 257–58) and that rate of interest the Millers will recover on whatever portion of the settlement money they are ultimately held to have been entitled to receive.

The Millers tried to show that because the settlement money was withheld from them, they had to borrow money elsewhere at somewhat higher rates of interest. The showing was based upon after the fact ratiocination. They also claimed that one of them made a number of trips to Billings to try to persuade the representatives of the Bank to let them have the money. However, it came out that this plaintiff, Robert Miller, was going to college in Billings, that he was there frequently, and that he thus had no particular reason to make a special trip to Billings to talk to the Bank. He failed to identify any particular trip as having that purpose. These kinds of speculative claims of damages will not do.

In short, we are of the opinion that the Millers' claim for relief for fraud and deceit is without sufficient support in the evidence and should be dismissed.

It follows that this is not a proper case for an award of punitive damages and the verdict of the jury awarding $20,000.00 punitive damages must also be reversed.

## VI.  Attorneys' Fees.

The Millers do not point to any provisions of the laws of Montana, or in any contract, authorizing an award of attorneys' fees to them in this case. Nikles v. Barnes, 1969, 153 Mont. 113, 119–120, 454 P.2d 608, 611–12. Accordingly, the judgment for attorneys' fees must be reversed.

## VII.  Conclusion.

The judgment entered upon the verdict of the jury is reversed and the claim for relief based upon alleged fraud and deceit is to be dismissed. The partial summary judgment appealed from is reversed and the case is remanded to the district court for further proceedings consistent with this opinion.