No. 80-210

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

L. D. STENSVAD, personally and as representative
of the investing shareholders of AGRI-SERVICES, et al.,

Plaintiffs and Respondents,

vs.

THE MINERS AND MERCHANTS BANK OF ROUNDUP, MONTANA,

Defendant and Appellant.

Appeal from: District Court of the Fourteenth Judicial District,
In and for the County of Mussellshell
Honorable R. D. McPhillips, Judge presiding.

Counsel of Record:

For Appellant:

Towe, Ball, Enright and Mackey, Billings, Montana
Thomas Towe argued, Billings, Montana
Gerald Neely argued, Billings, Montana

For Respondents:

Wright, Tolliver, Guthals and Prater, Billings, Montana
Kenneth Tolliver argued, Billings, Montana

Submitted: September 16, 1981

Decided: January 7, 1982

Filed: JAN 7 - 1982

*Thomas J. Kearney*
_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Appeal is by Miners and Merchants Bank from a judgment rendered against it on Stensvad's complaint in the District Court, Fourteenth Judicial District, Musselshell County. The bank had counterclaimed against Stensvad on unpaid promissory notes.

The District Court found that the bank had breached an agreement to finance Stensvad's corporations and after that breach had converted or appropriated his property, resulting in damages to Stensvad of $1,631,047, plus lost profits in the sum of $511,695. The court granted a set-off of $1,750,234 as of January 31, 1979 by reason of the indebtedness of the plaintiff to the bank. The court's net judgment of $392,508 against the bank was subsequently reduced nunc pro tunc by deducting $117,904 on June 23, 1980. The resulting judgment against the bank is $274,604.

The bank appealed from the judgment. There is no cross-appeal.

This action arises from a cattle-feeding operation located at Roundup and Melstone, Montana. The banking relationship between L. D. Stensvad and the Miners and Merchants Bank of Roundup (hereinafter Stensvad and the bank) commenced in 1965. The activities of the four corporations, all of which L. D. Stensvad represents in this case, played intertwining roles in the operation. Originally L. D. Stensvad Cattle Company would buy cattle and place them for feed in feedlots operated by M & S Cattle Feeders and by M. V. Enterprises, Inc. Agri-Services, Inc. purchased feed which it sold to the cattle feed operators. In reality, however, the four corporations for the purposes of this case

-2-

are L. D. Stensvad, personally, although there were other investing stockholders not shown in the record.

During 1965 and subsequent years, the bank loaned to Stensvad funds for the purchase and feeding of cattle for his personal account. In November 1968, Stensvad purchased feed mill facilities at Roundup, Montana, which substantially expanded his capacity to feed cattle. In the spring of 1968, he acquired 300 acres of land near Roundup and completed construction of a 3,500 animal feedlot. In the fall of 1969, an opportunity arose to place investor-owned cattle in Stensvad's feedlots. The investors desired financing to allow them to purchase cattle on margin and to feed cattle on margin. Arrangements were made between the bank and the various investors whereby the bank loaned to the investors funds for the purchase of feeding costs. The program was popular with investors, and the feedlot at Roundup was expanded with temporary facilities to accomodate additional cattle.

In early 1970, the bank indicated an inability to provide purchase money financing for the expanding investors-feeders group. As a result, this portion of the financing was placed with the Production Credit Association of Lewistown, Montana, during the spring of 1970, with the bank continuing to provide financing for the feeding costs of the cattle.

However, in order to simplify its recordkeeping, the bank requested and obtained a change in procedure which allowed the bank to loan the feeding cost funds directly to one of the four plaintiff corporations which were created for the purpose of conducting this business. During the summer of 1970, the bank advanced funds for the construction of additional feedlot capacity at Roundup, as well as for feed. The PCA made loans to investors for the purchase of

-3-

cattle to be fed at the facilities.

As of March 9, 1970, the PCA participation was on the following basis:  the borrowers (the California investors) advanced the sum of $100 per head in cash, or part in cash and part by letter of credit so as to provide $50 per head for feed to be supplied by Stensvad, and $50 toward the purchase of the cattle.  The PCA agreed to finance the balance of the purchase price of the cattle.

Until such time as Stensvad completed his financing with the PCA on each purchase, he obtained interim financing from the bank.  The monies advanced by the bank for the construction of additional feedlot capacity were carried by the bank on short-term notes, although the parties had in mind that such indebtedness would eventually be placed on long-term notes.  As of June 1971, however, this had not been done.

In June 1971, Edward Towe, a principal stockholder of the bank, indicated to Stensvad his intention to withdraw as a participant in the cattle-feeding program unless Stensvad withdrew his efforts from the creation of a new bank in Roundup.  Meetings between the bank and Stensvad culminated in a Stensvad agreement to withdraw from participation in the founding of the new bank and the bank's agreement to continue to provide financing as it had previously done for the cattle-feeding operation, operated by Stensvad and the plaintiff corporations.  In furtherance of this renewed commitment, the plaintiffs' furnished to the bank a complete portfolio of security interests in the plaintiffs' assets, as well as a guarantee from Otto Stensvad, the father of the plaintiff.

-4-

The arrangement under the June meeting continued until August or September 1971, when the bank found that it was overextended on its loans to the Stensvad corporations. Its officers went to Stensvad and asked that he arrange for the PCA to take over the feeding costs which would be involved in the fattening of the cattle with the bank to handle the interim financing. On September 7, 1971, the PCA, through its executive committee, changed its financing arrangement to this extent:

1. The margin requirement from investors was kept at $100 per head in cash or $50 per head in cash and $50 per head letter of credit to be paid by the borrower to the PCA prior to the disbursement of any loan funds.

2. PCA would finance the full purchase price of the cattle and provide $80 per head for feed. Feed requirements were to be budgeted by months, and PCA was not to advance these funds until the feed was actually consumed. No advancement of funds for stockpiling of feed was to be allowed. The feeder was to be paid by PCA upon presentation of invoices every two weeks.

On September 16, 1971, Stensvad wrote the bank setting out his need for interim financing after the changed PCA program. He said:

> "This does not mean, however, that there will be no need for any operating capital for our feed yards because as each lot of cattle is fed, there will be a 30 day delay between the time said cattle are put on feed and any money is received from the P.C.A., for we will be on a 30 day billing program. Since we purchase our feed and pay weekly, you can see that we will need interim financing for this purpose. In addition, of course, interim financing will be necessary to pay for cattle purchased for custom feeders between the time the cattle are contracted for, or bought outright, and the time the P.C.A. pays for the same. There is also a need for interim financing for accounts receivable and

inventory for our regular retail trade at
Agri-Services . . .

"The question may arise in your minds as to why
I still need $500,000 operating capital when I
have stated that I am having my feed financed
by the P.C.A.  This is explained above and I will further
clarify it here.  I will still need operating
interim financing for a 30 day period for feed
being fed to cattle owned by custom feeders.  The
security therefor [sic] would be accounts receivable.
The inventory necessary for each company for
interim financing for cattle contracted for and
purchased by L. D. Stensvad Cattle Co., an expected
increase in accounts receivable and inventory at
Agri-Services . . ."

On Friday, September 17, 1971, another meeting was held
at the bank between representatives of the bank, and Stensvad
and Stensvad's attorney.  In essence, the parties at that
time agreed:

During the transaction period from the old PCA program
to the new, there would be 4,000 or 5,000 head of cattle
under the old program, and as each pen was sold, Stensvad
would repay the Miners and Merchants Bank the amount of
money advanced by it when those cattle were put on feed.
Since new cattle were being purchased under the new program
to replace the cattle sold, and because of the proposal to
build up the number of cattle to as many as 13,000 to 15,000
head, the bank agreed "to immediately reloan the amount of
money repaid to the Miners and Merchants Bank when each pen
of cattle under the old program has been sold to enable me
to feed the cattle for the 30 days" before the PCA provided
the feed monies.

Stensvad confirmed the Friday, September 17, 1971
agreement in a letter of September 21, 1971, setting forth
substantially what is said above here, and in addition
stating:

-6-

"It was explained to the Miners and Merchants Bank that under the old program, the operating capital which had been extended to me amounted to $502,000. That under the new program, the total amount of operating capital which would be necessary would still amount to a total amount of $500,000, but that the operating capital would be earmarked as follows: [setting out the allocation between the 4 Stensvad corporations]."

On September 30, 1971, another meeting was held between the representatives of the bank and Stensvad. The only written evidence of the meeting is provided by Wally Otto, the PCA representative, who prepared a memorandum of the meeting. The bank apparently decided that the financial condition of the Stensvad operation was deteriorating badly. Otto reported that the current balance due to the bank was $440,000, secured by 1,000 head of cattle, not assigned, and 2,000 head of cattle, contracted for but not delivered, feed inventory of $90,000, accounts receivable of $180,000, machinery at $35,000, and prepaid fees to Stensvad.

The bank then requested the PCA to make all future checks jointly payable to the bank and Stensvad to which all parties agreed. The bank gave PCA a general release covering the cattle purchased and the feed paid for under the new program and the bank delivered also to the PCA manager an assignment that it had received from Stensvad granting to the bank all of L. D. Stensvad Cattle Company's rights to monies after the investor loans had been paid.

The record is unclear as to what occurred between September 30 and October 7, 1971. However, on October 7, 1971, the Board of Directors of the bank adopted the following resolution with regard to the Stensvad operations:

"The motion was made and seconded that present assigned income shall be received and applied to present notes with regard to all Stensvad Corporation loans and only the requested amount, namely, $10.00 per head per 15 days for each animal in the feed lot shall be advanced in addition to the advances needed to finance interm [sic] purchases of cattle for refinancing through PCA.

"Motion was made and seconded that no funds shall
be advanced hereafter for interm [sic] financing of
cattle purchased or for costs of feed in the
Stensvad cattle operation (all corporation)
unless such cattle and the feed in question are
to be fed to cattle located in the feed lots at
Roundup and Melstone, only."

Stensvad was notified of the resolution by letter on
October 8, 1971.

In the time that elapsed between the June meeting and
September 1971, Stensvad, although requested, had not presented
the bank with financial statements. Sometime, the date is
unclear, the bank received statements reflecting the financial
condition of the corporations. L. D. Stensvad Cattle Company
was particularly in bad shape. The accountant's report
showed a negative balance of about $271,000. Of the assets
claimed by the corporation, approximately $150,000 represented
bounced checks, and one of the liabilities was for nearly
$385,000 for prepaid feed.

On October 11, 1971, by letter from Stensvad's attorney,
Stensvad notified the bank that he considered the directors'
resolution a breach of the agreements made between Stensvad's
corporations and the bank. The letter demanded that the
bank assume control of the physical plant and operations of
the company. Stensvad claimed he had no operating funds with
which to pay employees, purchase feed or pay other expenses
because of the Board of Directors decision of October 7.

By letter of October 14, 1971, the bank confirmed to
the PCA representative that it would continue to finance the
interim funds necessary for operating money until permanent
financing was obtained from the PCA through its commitment
of October 11, 1971. On October 19, the PCA wrote to Stensvad's
corporations that it was notifying the investors in the
cattle feeding program of the assignment of the monies to
the bank. Apparently at this time Stensvad was "out of
trust" with the investors.

On November 16, 1971, the bank advised PCA that it would continue its loan arrangements with the Stensvad Cattle Company for the interim purchase of cattle and their feeding subject to a limitation of $5 per head per week. Also on November 16, 1971, the bank issued a letter stating it was taking over all the assets of the Stensvad Corporations and notified all that no cattle were to be removed from the feedyards or sold without first making arrangements with the bank.

Over the course of the next several months, the bank sold the assets of the Stensvad corporations. The sale of personal property resulted in the recoupment of $354,111.73. The cattle were eventually sold for $520,000. The real estate was foreclosed upon, and eventually sold to Faunco, another company which thereafter hired Larry Stensvad to run the cattle operation.

The District Court found that the commitment of the bank to finance the Stensvad corporations in the manner agreed to in June and in September 1971 was a binding agreement upon the bank; that no "change of circumstances" occurred between September 17 and October 7, 1971 when the bank's board of directors adopted the resolution we have set forth above; that the effect of the resolution was to eliminate any financing for the cattle operation conducted by the plaintiffs, to severely limit the corporation's ability to do business and to cause the eventual withdrawal of the PCA from financing the Stensvad operations.

The District Court, in reaching judgment, adopted November 11, 1979, as the accounting date between the parties. As of that date, the court found that Stensvad was indebted to the bank for all borrowings in the amount of $1,022,325.71.

-9-

The District Court concluded that the bank was entitled to interest, though it had found that the bank had breached the agreement to finance. Based on valuations which the District Court found the property to be worth at the time of the foreclosures and sales, and its computation of lost profits, the court entered a judgment based on the following elements:

DISTRICT COURT AWARD

A. STENSVAD CLAIM

1. Conversion of personal -- $354,111
   property

2. Conversion of cattle ----   382,000

3. Conversion of feedlot &
   elevators --------------   814,936

4. Mishandling of business -    80,000

5. Lost profits ------------   511,695

$2,142,742

B. BANK COUNTERCLAIM

1. Principle -------------$1,022,325

2. Interest through
   1/31/79 ----------------   727,909

3. Interest from 2/1/79 to
   judgment --------------   117,904

$1,868,138

NET JUDGMENT TO STENSVAD --------------   $  274,604

The issues argued by the bank in this appeal are as follows:

1. Whether the bank agreed to finance the Stensvad operation sufficient to keep the Stensvad companies in operation and sufficient to complete the business on hand or not less than the time required to complete the fattening of two cycles of cattle?

2. Whether, if such an agreement is found to have existed, it is unenforceable on grounds of indefiniteness, lack of mutuality, or failure of consideration?

-10-

3.  If such an agreement is found to be enforceable, whether it was terminable at will or breached by the bank?

4.  Whether, if such an agreement is enforceable and not terminable at will and breached by the bank, the evidence supports the awarding of any damages?

a.  Whether any damages are limited to the agreed interest rate and the interest rate required to obtain the money elsewhere?

b.  If not, whether the proper measure of damages is at most the amount of lost profits plus mismanagement of assets?

c.  Whether lost profits, if any, were proximately caused by the bank resolution of October 7, 1971?

d.  Whether there is any reasonable certainty that any lost profits would have in fact occurred?

e.  If so, whether the District Court erred in allowing testimony and exhibits showing gross profits per animal?

f.  If not, whether the level of lost profits awarded is appropriate?

g.  Whether the damages awarded for mismanagement of assets find support in the evidence, should have been admitted, are a duplication of lost profits, and are excessive?

h.  Whether the award of the cost of the fixed assets in the amount of $814,936 is supported by the evidence, excessive in amount, or even available in conversion?

5.  Whether the District Court erred in vacating its earlier order for a summary judgment in favor of the bank?

The respondent urges that the findings made by the District Court were proper in all respects, and additionally,

-11-

although it has not cross-appealed, urges that the District Court erred in allowing interest to the bank after the bank's breach of contract, and in failing to credit the cash funds received by the bank when liquidation of the Stensvad property against the loan balance before calculating interest due to the bank.

THE BANK'S CONTRACT TO LEND MONEY

The first issue we must determine is whether the District Court erred in finding that a contract existed between the bank and Stensvad to finance the feeder operation.

The District Court found that as of September 21, 1971, agreements had been reached between the bank and Stensvad to the effect that Stensvad would furnish or continue to furnish the bank with security interests in all of the plaintiff's assets; that the bank would continue to furnish financing for the four to five thousand head of cattle then in the plaintiff's feed lots, without modification; feed financing sufficient to feed the cattle under the modified agreement for 30 days; interim financing for the purchase of new cattle; feed financing for newly purchased cattle prior to their sale to PCA financed owners; feed financing for rancher owned cattle, and inventory and accounts receivable financing for Agri-Services, Inc.

In the absence of an express agreement as to the term of the bank's contracts, the court determined that it was in the contemplation of the parties that the term would be related to the investor-feeding contracts, the time required to fatten for sale two cycles of cattle.

-12-

Presumably the consideration moving to the bank was the interest, at rates ranging from 8 1/2 percent to 10 percent per annum on the unpaid balances, that would be collected during the operation of the agreement. An extra element of prejudice, however, was the agreement of Stensvad not to engage in the formation of another bank in Roundup. Such consideration meets the statutory definition of good consideration, section 28-2-801, MCA, a benefit agreed to be conferred upon a promissor to which the promissor is not likely entitled, or a prejudice suffered or agreed to be suffered by the promissee other than what he is at the time lawfully bound to suffer.

The District Court also concluded that the PCA participation in the Stensvad operation was dependent upon the agreement of the bank to furnish the necessary funds.

While the exact nature of the bank's agreement is arguable, especially as to term, the findings of the court must be supported on appeal where substantial evidence supports such findings and may not be set aside by us unless clearly erroneous. Rule 52(a), M.R.Civ.P.

The intention of the parties to a contract may be furnished by their conduct and declarations. Glantz v. Gabel (1923), 66 Mont. 134, 212 P. 858; section 28-2-103, MCA.

We conclude the District Court did not err in finding an agreement on the part of the bank to finance the Stensvad operation.

THE AWARD OF $511,695 FOR LOST PROFITS

To support this award, the District Court found and concluded that the bank's wrongful breach of contract prevented Stensvad from earning profits in his business; that Stensvad

-13-

had enough qualified investors to fill the lots to capacity; that the term of the investment contracts with the investors was the time required to fatten two cycles of cattle; that the bank's contract, though not expressed definitely, would reasonably require financing for two cycles of fattening; that Stensvad would realize net profits on yardage services, a 12 1/2 percent bonus from the investor's profits, and its anticipated feed profits; that a reasonable estimate of such profits was $511,695.

The bank objects to this item on the grounds that the Stensvad operation was not shown to be profitable; that the profits found by the court are gross, and not net profits, and are duplicative of other damages allowed.

The proper objective of an award of damages for wrongful breach of contract is to place the party wronged in as good position as if the contract had been performed. Kirby v. Kinyon-Noble Lumber Company (1976), 171 Mont. 329, 332, 558 P.2d 452, 454. The bank contends that the measure of damages should be limited to the cost of obtaining money elsewhere, when money is wrongfully withheld. See Miller v. Federal Land Bank of Spokane (9th Cir. 1978), 587 F.2d 415, 424, cert.den. 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067. Damages for loss of profits may be awarded if not speculative. Silfvast v. Asplund (1935), 99 Mont. 152, 161, 42 P.2d 452, 456. The rule that prohibits speculative profits does not apply to uncertainty as to the amount of such profits but to uncertainty or speculation as to whether the loss of profits is the result of the wrong and whether such profit would have been derived at all. Tri-Tron Intern. v. Velto (9th Cir. 1975), 525 F.2d 432, 437. Once liability is shown, that is the certainty that the damages are caused by the

-14-

breach, then loss of profits on a reasonable basis for computation and the best evidence available under the circumstances will support a reasonably close estimate of the loss by a District Court. Smith v. Zepp (1977), 173 Mont. 358, 370, 567 P.2d 923, 930. But no damages are recoverable which are not clearly ascertainable both in nature and origin, and only profits which are reasonably certain may be awarded. Smith v. Fergus County (1934), 98 Mont. 377, 386, 39 P.2d 193, 195.

The award of lost profits in this case may be sustained only if we can say that the profits are not based on speculation, since no profit record of the Stensvad enterprises was shown prior to the breach. We find here clearly that the damages for lost profits are speculative. There is no reasonable certainty in the record that Stensvad lost profits as the result of the wrong, or that a profit would have been derived at all. Tri-Tron Intern., supra.

In reaching our decision on this phase of the case, we have looked at evidence presented during the main trial, and in supplemental hearings. The procedural situation came about because the court ordered that the bank's claims of set off would be heard subsequent to the trial. The court made findings on all of the issues, except loss of profits by its order of December 14, 1978, and provided for supplemental hearings in that order respecting the loss of profits and additional evidence to be offered by the parties on the remaining claims.

A supplementary hearing was held before the District Court on January 22, 1979, and at that time, the parties entered into certain stipulations of fact, offered to enter into other stipulations of fact, and eventually agreed that

-15-

affidavits or other forms of evidence would be offered to the court for its consideration.

Thereafter, on February 20, 1979, an affidavit of Larry D. Stensvad was filed setting forth his claimed valuation of certain items, including cost of assets, proceeds from the sale of personal property by the bank and other items. On March 27, 1979, the bank filed a motion asking the court to adopt as facts certain proposed stipulations of fact which were attached to the motion, to take judicial notice of the accuracy of certain calculations, and to strike the affidavit of Larry Stensvad earlier mentioned. We find no record of how the court ruled on these motions, except that we find that some of the proposed facts were used in the court's final judgment from the affidavit of Stensvad.

Inasmuch as all relevant evidence is admissible (Rule 402, Mont.R.Evid.), we will advert to certain of the proferred evidence, as well as the record of the trial, in explaining why we determine that there is no reasonable certainty in the record or otherwise that Stensvad lost profits as the result of the claimed wrong of the bank, or that a profit would have been derived at all.

The financial statements for Agri-Services, Inc., show that on June 30, 1971, on total assets of $426,228.80, the corporation had retained earnings of $1,739.89. Included in the liabilities was an overdraft to the bank of $65,692.67. Cash on hand was $2,793.36. The statement as of October 31, 1971, for the same corporation, showed retained earnings totaling $4,368.15 on total assets of $401,871.10. In that four month interim, however, the short-term notes payable to the bank had increased to $198,999.99, from $187,000.00 on June 30, 1971.

-16-

The financial statements for M & S Cattle Feeders, Inc., show as of November 30, 1971, retained earnings of $7,813.89 on total assets of $260,638.59. Claimed assets include a stock subscription reserve of $17,499.57. The notes payable to the bank increase from $82,500.00 on June 30, 1971, to $110,874.79 on November 30, 1971. On June 30, 1971, this corporation had no cash on hand, and an overdraft to the bank of $241.22.

The financial statements for M. V. Enterprises, Inc. show retained earnings before provision for income taxes of $55,261.86, on total assets of $336,261.51. Notes payable to the bank at that time are shown in the sum of $159,597.86. The accountants noted with respect to the June 30, 1971 statement, that inasmuch as M. V. Enterprises, Inc. was part of a "brother-sister" group of controlled corporations, and the accountants not having been able to determine any inter-corporate transactions, the income tax liability could not be determined. We find no November 30, 1971 statement for M. V. Enterprises.

The financial statement of L. D. Stensvad Cattle Co. for June 30, 1971, is worthless. As it is, it reflects total assets of $421,802.55, and total liability of $692,860.72, for a negative net worth of $271,058.17. Even the claimed assets are questionable. The accountant reports:

"NOTE 3. This amount of $76,500.00 is represented by a check of $45,000.00 that did not clear Mr. Wilson's bank and $31,500.00 that Mr. Wilson did not remit to L. D. Stensvad Cattle Co. on client's deposit. Collection probability not ascertained as of now.

"NOTE 4. This $121,000.00 represents amounts withheld by Mr. Jack Dean from California cattle feeding clients as a commission. L. D. Stensvad Cattle Co. believes this is an error and steps to collect this are in process. Collection probability not ascertained as of now."

The liabilities include an item of $383,568.26 owed to Custom Feeding clients for advance payments on feed.

Most telling are the reports of the bank examiners who investigated the bankability of the loans made by this bank to the Stensvad corporations.

With respect to the Agri-Services, Inc. statement of June 30, 1971, the examiners noted:

"The operating results mentioned above
indicate insufficient cash flow to service and
repay indebtedness over a reasonable period
of time, there is no evidence of control of
the proceeds of sales from inventory, and the
extent to which collateral is shared between
this loan and placed paper behind the SBA loan,
indicates questionable margin at best. Further-
more, the indicated 7 1/2% owner equity is too
small to be expected to protect against shrinkage in
value in the event it should be necessary to resort
to force liquidation."

With respect to M. V. Enterprises, Inc.:

"A review of the checking accounts of subject
and affiliated companies indicates frequent
transfers of funds in substantial amounts between
the various affiliates to cover checks being
presented for payment and which apparently were
issued without sufficient funds on deposit to
cover at the time of issue or when originally
presented here for payment. In view of these
intercompany transactions and the apparent common
controlling ownership vested in Larry D. Stensvad
the borrowings of the affiliated companies must
be considered together, and all of them appear
to have the common weaknesses of undercapitalization
and disproportionate total debt and short-term
debt and virtually no working capital which necessitates
reliance on credit to sustain operations."

With respect to M & S Cattle Feeders:

"Review by bank management subsequent to date of
examination and subsequent to 60 M [$60,000]
advance made by bank indicates current assets
regarded as a source of repayment funds are limited
to feed inventories aggregating 31.4 M [$31,400]."

With respect to L. D. Stensvad Cattle Co.:

"Checks on subject company have been issued in
substantial amounts at times when insufficient
funds were on deposit to cover them. In this
connection it is observed that the checking
account of this firm was overdrawn in the amount

-18-

of $83,907.10 on 3-22-71 and the firm was
indebted on loans here on that date in the amount
of 110 M so that the liabilities of that firm
were far in excess of subject banks lending limit
on that date. Overdrafts have been noted on
other occasions also.

"At the time of a return visit to the bank on 11-12-
71 a fiscal year end (6-30-71) P.S. [financial
statement] had not been received for the L.D.
Stensvad Cattle Company, Inc. Despite the nearly
3 1/2 months since the end of the fiscal year
reportedly the accountant for the firm has been
unable to compile a financial statement that will
balance or which he is prepared to certify and
it has been indicated that unresolved differences
are in excess of 200 M, an amount between 2 and 3
times the NW [net worth] of the corporation in
the 12-31-70 PS above. In the absence of the
statement for this firm a consolidated PS for
the affiliated corporations cannot be compiled,
thus, the overall financial condition of the
related firms cannot be determined. Furthermore
the PSs on hand for the other corporations do
not include information on intercompany receivables
and payables that also would be needed for meaningful
consolidation. Also, the bank is without information
as to any obligations to other creditors of the
L. D. Stensvad Cattle Company, Inc., and does not
have a PS of Patton-Stensvad Cattle Feeders in which
L. D. Stensvad has a minority (40%) stock interest
and which has dealings with the L. D. Stensvad
Cattle Company, Inc.

"It appears that the bank is providing virtually
all of the operating capital for the various
enterprises in addition to financing the fixed
assets of the corporations and conclusive evidence
of collateral coverage cannot be ascertained.
Assets sufficient to cover liabilities is suggested
but not definitely established and the bank is
making every effort to exercise control of cash
proceeds for application on debts here."

We turn now to examine the method used by the District

Court in arriving at the lost profits figure of $511,695.00.

In its findings of fact, the District Court found that L. D.

Stensvad Cattle Company derived net profits from fees charged

cattle owners for yarding services, and from 12 1/2% bonus

based upon the cattleowners' profit from the sale of cattle.

It found that the profit figure of $511,695.00 is the amount

the plaintiffs would reasonably have been expected to realize

-19-

from yardage fees and the 12 1/2 percent bonus payments based upon the completion of existing business.

The District Court did not indicate what portion of the profit figure it attributed to bonus payments. In order to determine bonus payments, however, it must have utilized plaintiffs' trial exhibit no. 49, which purported to establish a net margin for investors based on a 600 pound steer when purchased, and sold at 1,050 pounds for a gain of 450 pounds.

In that exhibit, figures are utilized from the United States Department of Agriculture which showed the price that feeder cattle would bring in Kansas City as compared to the price that fat or fed cattle would bring in Omaha on the same day. The difference was tabulated to find the gross margin on that day for the cattle investor. Offset against this margin was the cost of feed which the witness determined from barley prices published by the Montana Crop Reporting Service, plus 30 cents for freight and handling. From these figures, based on the ratio of feed used to pound of weight gained, the witness computed a cost of gain, (averaging 20.8 cents per pound in 1972) which when multiplied by the theoretical 450 pound gain in the steer, produced the cost of feed for the steer. The difference between the gross margin and the cost of feed represented a net profit, on exhibit no. 49, to the cattle investor. The witness testified that irrespective of different prices that might prevail in the Roundup market or other Montana markets for the purchaser's sale of feeder cattle or fed cattle, the margin of profit could nevertheless be determined in the manner set forth in exhibit no. 49 because it would be the same nationwide. Such figures were computed for each month from November 1971 until December 1974 on exhibit no. 49. The evidence does

not indicate the date of each month on which the computations were made. It is strongly speculative whether such figures had any relationship to the Stensvad feeder operation. Most important, no computation for interest cost to the California investor that would be charged by the bank or by the PCA for the monies advanced by these institutions appears in exhibit no. 49.

Likewise, plaintiffs' exhibit no. 52 purports to show the income to be derived by Stensvad's operations, based upon the numbers of cattle to be fed in the pens from the business on hand on the date of the bank's alleged breach. A number is given in that exhibit for the average number of cattle per month, usually 13,000 head in the pens. Income is determined by multiplying the average number of cattle times 15 cents per day for 30 days. Offset against the income thus generated are fixed costs and variable costs. Fixed costs are shown as an unvarying $11,604.36. Variable costs are determined by multiplying the average number of cattle for that month by the figure of $1.44. The difference between the income generated, and the sum of the fixed costs and variable costs yields a profit to Stensvad on the exhibit.

When exhibit no. 52 was offered in evidence, it was stated that the computation for fixed costs and variable costs on that exhibit would be "connected up." However, such connecting up was never done. The result is a very speculative figure of profit used by the District Court in computing lost profits.

Stensvad contends in brief that the net operating profits of the Stensvad operation for the fiscal year ending June 1972 would be $207,615.12 and for the 1973 fiscal year $334,237.68. In addition, the bonus payments that would have

been received under the projections would equal $230,985.00 for 1971-1972, and $103,400.00 for 1972-1973. The total of these figures is $876,237.80. The court's finding of lost profits is approximately 59 percent of this total figure. We are unable to determine, and no brief of the parties delineates the basis for the award.

We cannot escape the conclusion that on the basis of the record here presented and the underlying evidence, that the award of the court for lost profits was based entirely on speculation, and no reasonable certainty appears to us to indicate that such profits were lost by the alleged wrong of the bank in refusing to further finance the Stensvad operations.

This is not to say that in a proper case, damages for lost profits are not recoverable, arising out of a breach by a lender of a contract to loan money. The authorities agree that such damages may be awarded, see Hunt v. United Bank & Trust. Co. (Cal. 1930), 291 P. 184, especially when the lender knows the intended use of the proceeds. In such case the profits which would have been made, as contemplated by the parties, are recoverable, Milbourn v. Buzzard (Okla. 1926), 252 P. 15, if they are established by factual data to a reasonable certainty, even in the absence of a past history of profitable operations. Welch v. U. S. Bancorp. Realty and Mortg. (Ore. 1979), 596 P.2d 947, 963-964. The borrower is not restricted in his damages to the cost of obtaining money elsewhere, as the bank contends in this case. See Welch, supra.

DAMAGES RECOVERABLE FOR BREACH OF CONTRACT

The District Court concluded, after finding that the contract to lend money existed, that the bank had breached its contract, and resultantly had taken over the property of Stensvad wrongfully. The damages awarded by the District Court are attacked from all directions by the bank. We have already indicated that the lost profits awarded by the bank

-22-

are improper in this case. We turn now to examine the other elements of damages awarded by the court in favor of Stensvad.

There can be little argument that the amount of $354,111.00 for the conversion of personal property awarded by the court is proper. It is substantially supported in the evidence and was the subject of a stipulation between the parties.

The item for conversion of cattle, $382,000.00, includes a profit of $104,897.73 made by the bank in the difference between what the bank would have received had the cattle been sold in November 1971, and the amount actually received at the later time of sale. The District Court, by awarding the full amount received by the bank from the sale of the cattle, $382,000.00, gave Stensvad the benefit of the profit made by the bank in making the sale as it did.

The item of $80,000.00 for mishandling of business, however, must be examined by us, and amended downward.

The District Court awarded Stensvad the sum of $80,000.00, for the "losses sustained by the plaintiffs during the process of the Bank's wrongful foreclosure, for loss of downpayments on cattle, for loss of livestock through death, and for losses sustained through the disruption in shipment of the cattle."

The evidence sustains $58,000.00 of that award. Larry Stensvad testified that at the time of the take-over by the bank, his operations had paid out $58,000.00 on agreements for the purchase of cattle, and that these sums were forfeited to the prospective sellers when Stensvad was unable to complete the contracts of purchase. Such an item of damages is within the contemplation of section 27-1-311, MCA, with respect to the measure of damages for the breach of contract, because they were proximately caused by the take-over, and

-23-

in the ordinary course of things would be likely to result therefrom.

The remaining part of the $80,000.00 award, that is the sum of $22,000.00, is apparently based on this portion of the record:

> "Q. Mr. Stensvad, I would like to direct your attention to the situation involving the cattle that were moved from the lot in Roundup to the lot at Melstone by the bank after the bank took control of these cattle. Did you have occasion to review the closeout figures produced by the bank, with regard to these cattle? A. The bank didn't produce the closeout figures on them. I produced the closeout figures on them.

> "Q. How did you obtain this information? A. Well, I had the information on what the cattle weighed when they went in down there, and then when the cattle were shipped, in terms of weight and numbers. And when the cattle were shipped out of the Melstone yards in the spring of 1972, I was there and obtained copies of the weights when the cattle went out, and numbers, so that I could compare the weights going out with the weights going in, as well as numbers. And then I also--the bank used forms that we were using at the time, before they took over, to keep track of daily feed fed out to the cattle, while they had it. And I had the opportunity to have those records to prepare feed consumption and cost data on the cattle while they had them in there. Then I returned these documents to the yards down there, when I completed my calculations.

> "Q. From these documents that you had at this point in time, did you prepare a calculation as to the amount of money that was lost by reason of the manner and means in which the cattle were cared for and fed. A. Yes, I did.

> "Q. And what was that amount? A. The amount was a few dollars over $22,000.00."

Missing from the foregoing testimony is any basis upon which it could be determined that the bank overspent for feed, or underfed the cattle, or that the amounts spent by the bank in caring for the cattle until they were sold were unreasonable. Damages which are not clearly ascertainable in both their nature and origin cannot be recovered for a breach of contract. Section 27-1-311, MCA.

-24-

We next consider the award of $814,936.00 for the loss of Stensvad's feedlots and elevators. The District Court in its findings based this award upon the original cost of construction and acquisition. Among the various values of the feedlot and elevators appearing in the evidence, the award is top dollar. On the books of three of the Stensvad corporations (L. D. Stensvad Cattle Co. had no fixed assets) the feedlots and elevators were carried at a depreciated value of $430,944.81 in total.

At the request of Larry Stensvad, in April 1972, Hall and Hall, appraisers from Billings, appraised the fair market value of the Melstone feedlot, the Roundup feedlot, the Roundup mill and rolling stock, and found a total market value of $488,000.00. At the time of the sheriff's sale on foreclosure, the bank bid in for the feedlot and elevators the sum of $200,000.00, and was the successful bidder. Later the bank contracted to sell the feedlots and elevators to Roundup Feeders, Inc., a corporation formed by the owners of the bank, for $350,000.00. Roundup Feeders, Inc. in turn leased the properties to a corporation named Faunco, Inc., for cattle feeding operations under the management of Larry Stensvad, which resulted in a payment of $176,731.00 lease payments either to Roundup Feeders, Inc. or the bank, the record is not clear. On March 27, 1979, the bank offered to stipulate that as of June 30, 1971, the value of the fixed assets of the Stensvad corporations was $696,968.00.

In Bos v. Dolajak (1975), 167 Mont. 1, 6, 534 P.2d 1258, 1260, we quoted with approval from Spackman v. Ralph M. Parsons Company (1966), 147 Mont. 500, 506, 414 P.2d 918, 921, though it related to personal property, the following quotation:

-25-

"As for the issue of compensatory damages, the question is always a difficult one. In tort actions, the wrongdoer is liable, in general, for any injury which is the natural and probable consequence of the wrong. These may include both the direct and indirect, but reasonably probable, results of the wrong. Where damage to the property is concerned, the purpose of awarding damages is to return the party injured to the same, or as nearly possible the same, condition as he enjoyed before the injury to his property. The injured party is to be made as nearly whole as possible--but not to realize a profit. Compensatory damages are designed to compensate the injured party for actual loss or injury--no more, no less."

In Bos, supra, we approved a measure of damages based on replacement cost of a silo, in an action for breach of contract to erect a silo, but in that case it appeared that the replacement item was a second-hand silo and its cost was well within the actual market value of the silo that was destroyed. The fairest value of the feedlots and elevators in this case, found by a professional and untinged by any personal bias of the parties, is the fair market value found by Hall & Hall, the sum of $488,000.00. We find the District Court should have used that figure in a determination of the proper amount to be awarded to plaintiff for his ouster from the feedlots and elevators. It should be noted however, that Hall & Hall's appraisal included Stensvad's rolling stock. The value of the rolling stock is already included in the personal property award of $354,111.00. The auction receipts from the sale of the rolling stock which were included in that amount were $66,064.70. We should in fairness deduct the value of the rolling stock from Hall & Hall's appraisal of the feedlots and elevators, which leaves a net figure rounded market value of $411,935.00 as the proper value of the feedlots and elevators.

Accordingly, we amend the District Court's award of damages to Stensvad as follows:

| | | |
|---|---|---:|
| 1. | Conversion of personal property | $354,111.00 |
| 2. | Conversion of cattle | 382,000.00 |
| 3. | Value of feedlot and elevators | 411,935.00 |
| 4. | Mishandling of business | 58,000.00 |
| 5. | Lost profits | 0 |
| | TOTAL | $1,206,046.00 |

THE SET-OFF TO THE BANK

The District Court found, and the parties agree, that the principal amount of the notes due and owing to the bank as of November 11, 1971, was the sum of $1,022,325. The District Court however, awarded interest on that amount to the date of the judgment. In view of the fact that the Stensvad property taken by the bank and sold as collateral for the indebtedness due it, exceeded in value as we have above shown the amount of the principle indebtedness, it is improper in this case to award interest to the bank on the note balances to the date of judgment. Once the value of the collateral had been applied to the principle indebtedness through means of foreclosure and other sales, Stensvad's obligation for further interest on those notes to the extent of collection was obviously terminated. The bank is entitled to a set-off of no more than the amount of the principal indebtedness as of the date of the breach found by the District Court.

THE ISSUE OF SUMMARY JUDGMENT

When this action was first commenced, the then presiding district judge granted summary judgment in favor of the bank. Plaintiff filed a motion for reconsideration of the summary judgment when a second judge was qualified to sit on the cause. The second judge, considering the issues, reversed the summary judgment and opened the cause for trial. In spite of the bank's contentions to the contrary, it is clear that material questions of fact existed from the inception

-27-

of this litigation and that the first entry of summary judgment was improper. We find no merit therefore in the bank's contention that the District Court improperly reversed the stand on the summary judgment question.

CONCLUSION

The amount of the Stensvad claim, as we find it above, is subject to a set-off to the bank in the sum of $1,022,325. We therefore remand this cause to the District Court with instructions to modify the judgment heretofore entered in this cause, and to enter judgment in favor of Stensvad in the sum of $183,721, which when paid, shall constitute full and final settlement of all claims of L. D. Stensvad, personally, and as representative of investing shareholders of the corporations and of the corporations. Interest on the amount of the judgment shall run from the date of its entry after remittitur herein. Costs to Stensvad.

_____
                Justice

We Concur:

_____
     Chief Justice

_____

_____

_____
                Justice

-28-

Mr. Justice Fred J. Weber dissents:

I commend Justice Sheehy for his careful and competent analysis of the complex and confusing facts in this case. He has done an excellent job in putting together an understandable opinion.

I agree with the conclusion of the majority that the bank did have an agreement to loan money to the Stensvad interests. However, I find there was an ample factual basis for the termination by the bank of that agreement to loan money, and the subsequent taking of possession of the Stensvad properties. The majority opinion refers to the reports of bank examiners, who examined the Stensvad loan on November 12, 1971, just prior to the taking possession of the assets by the bank. The examiners point out that on November 12, nearly three and one-half months after the end of the fiscal year of Stensvad Cattle Co. Inc., the firm had been unable to compile a financial statement which would balance and which the accountant was prepared to certify. The examiners noted that as of June 30, 1971, checks had been issued in substantial amounts when insufficient funds were available to cover. The majority opinion points out that as of June 30, 1971, L. D. Stensvad Cattle Co. had a negative net worth of $271,058.17 with questionable assets even on that statement. In addition, there is evidence that during the weeks prior to taking of possession by the bank, Stensvad failed to remit substantial funds to the bank, Stensvad had failed to make payments to his investors, and funds were being diverted to other feedlot operations in direct disregard of bank instructions. As pointed out in the majority opinion, during all of 1971, Stensvad was grossly under financed,

which made his operations subject to any adverse turns in the market. All of these facts are a sufficient basis for the action taken by the bank. I would therefore hold that the bank properly terminated the agreement to loan money to Stensvad, and refused to make additional loans, and properly took possession of the various assets which constituted security for the loans.

I do concur with the majority opinion that the award of lost profits at the District Court level was speculative and not sustainable. I also agree that the valuation of the personal property in the amount of $354,111.00 and the value of the feedlot and elevators in the amount of $411,935.00 is correct. I would reduce the cattle valuation of $382,000.00 by the profit of $104,897.73 made by the bank because I would not find a conversion of the cattle. I would also eliminate the award of $58,000.00 for mishandling of business. Last, I would award interest to the bank after the appropriate reduction of its loan totals by the assets repossessed.

Justice

-30-

IN THE SUPREME COURT OF THE STATE OF MONTANA

------------

No. 80-210

------------

L. D. STENSVAD, personally and as
representative of the investing
shareholders of AGRI-SERVICES, INC.,
M. V. ENTERPRISES, INC., M. & S.
CATTLE FEEDERS, and L. D. STENSVAD
CATTLE CO., all Montana Corporations,

Plaintiffs,

vs.

THE MINERS AND MERCHANTS BANK OF
ROUNDUP, MONTANA,

Defendants.



FILED

FEB 25 1982

Thomas J. Kearney

CLERK OF SUPREME COURT
STATE OF MONTANA

------------

ORDER DENYING PETITION FOR REHEARING

------------

We deny petition of defendant bank for rehearing of our
opinion entered January 7, 1982 with the following comments:

1. Petitioner bank contended it is entitled to a set-off
for interest accrued on the principal indebtedness on the notes
from the date of breach until the monies received on foreclosures
by the bank were applied on the notes. We so indicated in our
opinion. However, we carefully searched the record to determine
the applicable amounts and dates, and were unable to identify
either in any case. This Court is bound by the record before
us. Therefore, we held that the set-off would be the amount of
principal indebtedness as of the date of the breach on facts
found by the District Court.

2. Petitioner contends respondent is not entitled to the
benefit of the profit realized by the bank after it had taken
possession of the cattle and eventually sold the same. We do
not agree, but point out that if we did, it would result in

-1-

a higher judgment against the bank in the amount of the profit.

3. Petitioner contends that its foreclosure of the properties has been hampered by lis pendens filed by Stensvad. We have no record of that before us, but in any event, Stensvad, we assume, must dismiss any lis pendens which relate to issues settled in this appeal upon payment of judgment by respondent.

According, the petition for rehearing is denied.

DATED this 24th day of February, 1982.

_____
Chief Justice

_____

_____

_____

_____
Justices