DA 11-0722

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 319

DAVID L. McEWEN and LENORA D. McEWEN,

      Plaintiffs and Appellees,

    v.

MCR, LLC and MCR TRANSMISSION, LLC,

      Defendants and Appellants.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Toole, Cause No. DV 08-072
Honorable Laurie McKinnon, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

      John G. Crist; Crist, Krogh & Nord, LLC, Billings, Montana

      For Appellee:

      Kevin S. Brown; Fred Paoli, Jr.; Paoli & Brown, P.C., Livingston,
Montana

Submitted on Briefs:  September 12, 2012
Decided:  December 31, 2012

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1      MCR, LLC (MCR) filed an action for condemnation of a compressor station site on property owned by appellees David and Lenora McEwen (McEwens). McEwens counterclaimed against MCR for damage to McEwens' property. McEwens also claimed punitive damages. McEwens sought restoration costs as the measure of damages for their contract, trespass, and nuisance claims. The parties stipulated to the substitution of MCR Transmission, LLC (MCR-T) for MCR on the condemnation claim.

¶2      The District Court denied MCR-T's motion for a preliminary condemnation order. The District Court granted McEwens' summary judgment motion that allowed McEwens to seek restoration costs. The jury awarded restoration costs and punitive damages to McEwens. MCR and MCR-T appeal. We affirm in part, reverse in part, and remand.

¶3      MCR and MCR-T present the following issues on appeal:

¶4      *Issue One. Whether the District Court properly denied MCR-T's motion to condemn McEwens' property for a compressor station.*

¶5      *Issue Two. Whether the District Court properly determined that McEwens were entitled to seek restoration costs as the measure of their damages.*

¶6      *Issue Three. Whether the District Court properly admitted evidence at trial that MCR had jumped McEwens' bid on state trust land leases.*

PROCEDURAL AND FACTUAL BACKGROUND

¶7      McEwens purchased their ranch near the Sweet Grass Hills in Toole County, Montana, in 1992. McEwens took the ranch subject to a lease of two acres by Fulton Fuel Company (Fulton) on which sat a compressor station. MCR-T purchased Fulton's interest in

2

the compressor station in 2004. MCR-T entered into a five-year lease with McEwens to continue to operate the compressor station.

¶8 MCR operated natural gas wells on McEwens' property pursuant to MCR's mineral rights. MCR needed a place to dump produced water from one of its wells. MCR and McEwens entered into a contract that allowed MCR to dump this produced water from one well into a pond on McEwens' property. The contract required MCR to provide McEwens with water tests of the produced water every six weeks. McEwens wanted the water test results due to the fact that McEwens believed that produced water from a different well had killed some of McEwens' sheep in 1996. McEwens wanted to ensure that the produced water did not contaminate their pond.

¶9 MCR failed to test the produced water every six weeks as required under the contract. In fact, McEwens alleged at trial that MCR had deposited produced water from two other wells into the pond, including produced water from the sour well that may have killed McEwens' sheep in 1996.

¶10 MCR also caused significant damage to McEwens' property over this same time period. MCR employees defecated and littered on McEwens' property. MCR disturbed McEwens' property for a variety of pits, tanks, and pipelines. MCR did not reclaim McEwens' property after it had completed these projects.

¶11 McEwens and their predecessors had leased four 40-acre parcels of state trust land as agricultural grazing for their livestock. McEwens paid $6.97 per animal unit month (AUM). MCR bid on this leased land in 2009. MCR never had ranched or raised cattle or other livestock before it submitted the bid. MCR has not ranched or raised livestock since that

3

time. McEwens alleged at trial that MCR had submitted this bid out of spite and that the bid represented another instance of MCR treating McEwens with malice. McEwens successfully matched MCR's bid and retained the lease on the state trust land. MCR's bid forced McEwens to pay $36.97 per AUM. The State ultimately refunded part of this money, but McEwens had to pay almost twice what they had been paying previously as a result of MCR's bid.

¶12 McEwens and MCR-T failed to reach an agreement to renew the lease for the two-acre parcel where the compressor station sits. MCR filed an action for condemnation of the compressor station site. McEwens counterclaimed against MCR for breach of contract, trespass, nuisance, and violations of the Surface Damages Act, and sought punitive damages. McEwens sought restoration costs as the measure of damages for their contract, trespass, and nuisance claims. The parties stipulated to substitution of MCR-T for MCR on the condemnation claim.

¶13 The District Court dismissed MCR-T's condemnation claim. The court relied on the holding in *McCabe Petroleum Corp. v. Easement & Right of Way Across Township 12 N.*, 2004 MT 73, 320 Mont. 384, 87 P.3d 479, that eminent domain power cannot be implied or inferred from vague language, and that it must not exist merely by implication. *McCabe*, ¶ 12. The District Court determined that the legislature's failure to enumerate compressor stations in the list of public uses in § 70-30-102, MCA, excluded a compressor station as a public use. This determination left MCR-T unable to pursue its condemnation action.

¶14 The District Court issued an order on summary judgment that McEwens could seek restoration damages for their breach of contract, trespass, and nuisance claims. The District

4

Court instructed the jury at the close of trial that it could award McEwens' costs necessary to restore McEwens' property to the condition in which it existed before MCR dumped the produced water. The District Court allowed McEwens to introduce evidence that MCR had jumped McEwens' bid on state trust land. The jury awarded restoration costs and punitive damages to McEwens. MCR and MCR-T appeal.

## STANDARD OF REVIEW

¶15 We review for correctness a district court's conclusion of law. *Varano v. Hicks,* 2012 MT 195, ¶ 7, 366 Mont. 171, 285 P.3d 592. We review de novo a district court's grant of summary judgment. *Lampi v. Speed*, 2011 MT 231, ¶ 10, 362 Mont. 122, 261 P.3d 1000. Summary judgment may be granted only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Lampi*, ¶ 11.

¶16 A district court possesses broad discretion when it determines the admissibility of evidence. *McCormack v. Andres*, 2008 MT 182, ¶ 22, 343 Mont. 424, 185 P.3d 973. We review for abuse of discretion a district court's evidentiary rulings. *McCormack*, ¶ 22. A district court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or so exceeds the bounds of reason as to work a substantial injustice. *McCormack*, ¶ 22.

## DISCUSSION

¶17 *Issue One. Whether the District Court properly denied MCR-T's motion to condemn McEwens' property for a compressor station.*

¶18 Eminent domain involves the State's inherent right to take private property for public use. Section 70-30-101, MCA. The Montana legislature further has endowed private

5

individuals with eminent domain power for specific activities that the legislature has deemed public uses. Section 70-1-205, MCA.

¶19 Section 70-30-111(1), MCA, first requires MCR-T to demonstrate that its proposed use of McEwens' property qualifies as a public use under § 70-30-102, MCA. MCR-T then must demonstrate that it needs McEwens' land for the proposed public use. Section 70-30-111(2), MCA. MCR must demonstrate both of these factors by a preponderance of the evidence. Section 70-30-111, MCA.

¶20 The legislature has declared gas pipelines to constitute a public use. Section 70-30-102(4), MCA. MCR-T argues that natural gas compressor stations represent an essential component to distribute natural gas through a pipeline. MCR-T alleges that the natural gas that it seeks to transport remains static in the pipelines at a pressure of approximately 20 pounds per square inch. The compressor station raises the pressure on the gas from 20 pounds per square inch to above 600 pounds per square inch to move the natural gas in the pipeline. MCR-T claims that it would be unable to deliver natural gas through the pipeline without a compressor station.

¶21 We strictly construe the legislature's grant of eminent domain power. *McCabe*, ¶ 14. We look to the plain language set forth by the legislature and do not imply a more extensive grant of power. *McCabe*, ¶ 14. We also interpret the statute to avoid absurd results. *Mont. Power Co. v. Cremer*, 182 Mont. 277, 280, 596 P.2d 483, 485 (1979).

¶22 The legislature has provided that pipelines that transport gas constitute a public use. Section 70-30-102(4), MCA. Compressor stations sometimes prove necessary to force natural gas through a pipeline. We agree with MCR-T that an absurd result would ensue if

we allowed a private party to exercise eminent domain power to construct and operate a pipeline, but did not allow the same private party to exercise eminent domain power to construct and operate a compressor station necessary to make the pipeline work properly. *Mont. Power Co.*, 182 Mont. at 280, 596 P.2d at 485. The legislature intended to allow a private party to exercise eminent domain power both for a gas pipeline and also for a compressor station required for the gas pipeline to transport natural gas.

¶23 This determination does not end the inquiry. Section 70-30-111(2), MCA, further requires MCR-T to show, by a preponderance of the evidence, that the taking of McEwens' property "is necessary" to MCR-T's proposed public use. McEwens do not seem to dispute that MCR-T needs a compressor station somewhere in the vicinity to pressurize natural gas that otherwise would remain static in the pipeline. MCR-T seeks a summary judgment order that McEwens' property proves necessary as the location for the compressor station. McEwens also presented evidence, however, that other similarly situated land, not owned by McEwens, may be available for MCR-T to locate a compressor station. McEwens' evidence raises a genuine an issue of material fact as to whether McEwens' property proves necessary for the compressor station. Section 70-30-111(2), MCA. The existence of this genuine issue of material fact precludes summary judgment.

¶24 We reverse and remand for further proceedings to resolve whether MCR-T can meet all of the criteria contained in § 70-30-111, MCA. MCR-T must meet all of the criteria before § 70-30-111, MCA, would allow MCR-T to exercise eminent domain authority. These criteria include whether the placement of the compressor station on McEwens' private property proves necessary to MCR-T's operation of its natural gas pipeline. Section 70-30-

7

111(2), MCA. The parties can present evidence regarding all issues related to the necessity of McEwens' property as the site of MCR-T's compressor station before the District Court.

¶25 The District Court also may address on remand McEwens' claim that MCR-T seeks to use the land on which the compressor station sits for purposes not delineated under § 70-30-102, MCA. These alleged uses include holding field meetings, parking contractor equipment, and storing an aboveground diesel tank and an aboveground gas tank. The court can assess in the first instance McEwens' arguments that these ancillary uses exceed the scope of § 70-30-102, MCA.

¶26 *Issue Two. Whether the District Court properly determined that McEwens were entitled to seek restoration costs as the measure of their damages.*

¶27 On the third day of trial, the District Court granted McEwens' motion on whether they were entitled as a matter of law to seek the costs of restoring their property as the measure of damages. The court's decision allowed McEwens to present evidence to the jury about the cost of restoring their property.

¶28 This case follows our decisions in *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, 338 Mont. 259, 165 P.3d 1079, and *Lampi*. We take this opportunity to clarify our approach to a party's claim for damages to property. Diminution in property value has long been recognized as a measure of damages for injury to property. *Sunburst*, ¶ 30; *Burk Ranches v. State*, 242 Mont. 300, 305, 790 P.2d 443, 445-46 (1990). An award of damages equivalent to diminution in property value places the plaintiff in the position that he would have been but for the injury where the costs to restore the property correspond with the diminution in property value. By contrast, where the costs of restoring the property to the

8

condition in which it existed before the injury exceeds the diminution in property value, a party will not be made whole by an award of diminution in property value. *Sunburst*, ¶ 37; *Lampi*, ¶ 21.

¶29 We rejected a strict cap on property damage in *Sunburst*. This Court instead adopted the *Restatement (Second) of Torts § 929* cmt. b, to allow a party to elect restoration costs as his measure of damages in appropriate cases. *Sunburst*, ¶ 38; *Lampi*, ¶¶ 22-23. We use the term "restoration damages" as shorthand to refer to an award of damages that disproportionately exceeds the diminution in value of the property and reflects the amount that the party will be forced to spend to restore his property to its previous condition. An award of restoration damages may be necessary in certain cases to compensate fully an injured party. *Sunburst*, ¶ 33.

¶30 A party must show in all cases that the property damage represents a temporary injury in order to receive restoration costs. *Lampi*, ¶ 32; *Burley v. Burlington N. & Santa Fe Ry. Co.*, 2012 MT 28, ¶ 98, 364 Mont. 77, 273 P.3d 825. To be eligible to receive restoration costs disproportionate to the diminution in value, however, the party also must show that the plaintiff possesses personal reasons for wanting to restore the property to its prior condition. *Lampi*, ¶ 29. No requirement to establish personal reasons exists when the restoration costs do not exceed disproportionately the diminution in value of the property. The threshold disproportionality determination between the restoration costs and the diminution in value triggers the personal reasons analysis. *Restatement (Second) of Torts § 929* cmt. b; *Sunburst*, ¶ 38.

9

¶31    To reiterate, a party must establish the threshold factor of a temporary injury whenever the party seeks restoration costs.  A temporary injury includes damage to property that can be restored to substantially the same condition that the property had been before the injury.  *Lampi*, ¶ 32; *Burley*, ¶ 98.  A party must establish the threshold factor of personal reasons only when the party seeks restoration costs disproportionately in excess of the diminution in value.  The personal reasons analysis includes a determination of whether the plaintiff genuinely intends to restore the property.  *Lampi*, ¶ 31.

¶32    The cost of restoring the land beneath the contaminated ponds on McEwens' property to its previous condition exceeded the value of the property.  McEwens' contaminated property had an estimated value of between $850 and $2400.  The evidence at trial demonstrated that the cost of restoring McEwens' contaminated property fell between $138,000 and $2.2 million.  This disproportionality between the restoration costs and the diminution in value required McEwens to establish personal reasons in order to be eligible to recover restoration costs.  *Restatement (Second) of Torts § 929* cmt. b; *Sunburst*, ¶ 38; *Lampi*, ¶ 23.

Summary Judgment on Restoration Damages

¶33    Whether a plaintiff qualifies for restoration damages ultimately presents a question of law.  *Sunburst*, ¶ 28.  The availability of restoration damages depends, however, on the existence of certain facts.  *Lampi*, ¶ 48.  Whether a party possesses personal reasons for wanting to restore the property, and whether the injury to the property can be classified as temporary, determine the injured party's eligibility for restoration damages.  *Lampi*, ¶ 23. A fact-finder must resolve any genuine issues of material fact as to the existence of these two

10

predicate facts. *Lampi*, ¶ 48. This factual finding guides the court in determining the proper measure of damages.

¶34 A court may enter a judgment as a matter of law as to these factual questions only if reasonable minds could not differ on whether the injury to the property qualifies as temporary and whether the plaintiff possesses personal reasons for wanting to restore the property. *Lampi*, ¶ 44. MCR argues that the question of whether McEwens presented sufficient personal reasons for seeking to restore their property presents a question of fact for the jury to decide. *Lampi*, ¶ 48. We agree. *Lampi*, ¶ 48. This case went to trial, however, before this Court had issued its decision in *Lampi* that clarified that these underlying factual questions should be resolved by the jury. *Lampi*, ¶ 48.

¶35 The District Court and the parties all believed that McEwens' entitlement to restoration damages properly presented a question for the District Court to decide on summary judgment. The parties did not recognize that the existence of personal reasons, or the temporary nature of an injury, generally present factual questions for a fact-finder to resolve. The District Court should have allowed the jury to resolve the conflicting genuine issues of material fact presented by the parties regarding whether McEwens possessed personal reasons for seeking to restore the property. As a result, we first evaluate whether the District Court's decision that McEwens were entitled to restoration damages as a matter of law qualifies as harmless error under the facts of this case. An error mandates our reversal of the district court when the error caused substantial prejudice. *In re Marriage of Stevens*, 2011 MT 124, ¶ 22, 360 Mont. 494, 255 P.3d 154; *In re S.C.*, 2005 MT 241, ¶ 29, 328 Mont. 476, 121 P.3d 552; M. R. Civ. P. 61 (2009).

11

¶36     The jury heard all of the evidence that the District Court used in making its decision that McEwens were entitled to restoration damages as a matter of law. McEwens presented evidence to the jury regarding the temporary nature of the injury. The produced water created excessive sodium levels in the soil beneath the pond. Dr. James Bauder testified that the soil beneath the pond could be removed and replaced at a cost of $2.2 million. Dr. Bauder further testified that the excess sodium, alternatively, could be removed from the soil at a lower cost with the help of chemicals or other soil amendments. Dr. Bauder expressed skepticism, however, that this alternative would restore the pond fully because this method would require water drainage through the soil.

¶37     MCR concedes the temporary nature of the damage to McEwens' property. Its own expert, Mr. Fehringer, testified that the soil beneath the pond would drain sufficiently that soil amendments would be effective to restore the property substantially to its condition before the contamination. Mr. Fehringer testified that this process would cost $138,000. Mr. Fehringer conceded that his estimate assumed certain conditions, the absence of which would increase the restoration costs.

¶38     McEwens also presented evidence to the jury about their personal reasons for wanting to restore their property. A landowner's motivation for holding property provides useful guidance with regard to the question of whether personal reasons exist. *Lampi*, ¶ 39. David McEwen and Lenora McEwen testified that ranching represents their way of life. They live and work on the ranch. McEwens believe that they have a duty to maintain the condition of their property for future generations. They intend to pass their property to their children so that their children can continue to ranch.

12

¶39     McEwens further testified to their use of the pasture on which the contaminated pond sits. This use amounts to grazing cattle for several months each year. The contamination from the produced water forced the McEwens to stop using the pasture. The closure of this pasture forced McEwens to buy additional feed for their livestock because they no longer could graze their livestock in the pasture with the contaminated pond. McEwens testified to the availability of other nearby sources of water. MCR elicited this information through cross-examination of McEwens. MCR's cross-examination further elicited the fact that McEwens' personal recreational use of the pond amounted to a single ice-skating outing during the past 20 years.

¶40     The introduction of this evidence at trial permitted the jury to consider this evidence when it assessed the liability of MCR and when it decided whether to award damages to McEwens. The court instructed the jury that the McEwens would be entitled to recover "the amount of money required to put them in the position they would have been if MCR had not breached its contractual obligations." The court separately instructed the jury regarding any damage to McEwens' property: "the damages awarded should return the party injured to the same, or nearly as possible to the same condition as he enjoyed before the injury to his property." The court further limited the award for damages to property to "all costs that reasonably would be necessary" to restore the McEwens' property to the condition it would have been absent the contamination.

¶41     These jury instructions permitted the jury to award damages to McEwens that exceeded the value of McEwens' property. These jury instructions did not require the jury, however, to award an amount in excess of the value of McEwens' property. In each

13

instance, the court instructed the jury that it "may" award restoration costs on the tort claims and that McEwens "may" recover restoration costs for damage to property. The jury heard McEwens' testimony that they rarely used the contaminated pond for recreational purposes. The jury also heard McEwens' admission that other nearby sources of water existed. The jury considered these factors as it determined whether to award restoration damages that exceeded the diminution in value of McEwens' property.

¶42 We cannot say that the District Court's decision that McEwens were entitled to restoration damages as a matter of law substantially prejudiced MCR. MCR conceded the temporary nature of the injury. The jury heard all of the evidence related to whether McEwens had personal reasons for wanting to restore their property. The District Court instructed the jury regarding its ability to award reasonable damages. The District Court's decision to grant McEwens motion for their entitlement to restoration damages as a matter of law qualifies as harmless error under these conditions. *In re S.C.*, ¶ 29.

*"Objectively Reasonable" Use*

¶43 MCR further argues that the jury separately must find the property owner's personal reasons to be "objectively reasonable." McEwens contend that the District Court's decision that McEwens were entitled to restoration damages as a matter of law precluded the jury from assessing this element of restoration damages. MCR points to *Osborne v. Hurst*, 947 P.2d 1356 (Alaska 1997), where the trial court improperly disregarded evidence in the record of the plaintiffs' interest in the property's unique views and abundant trees. The court noted that the plaintiffs' personal reason must itself be "objectively reasonable." *Osborne*, 947 P.2d at 1360.

14

¶44    MCR suggests that the jury must have found that it was reasonable for McEwens to use the damaged property for several months each year to graze their livestock. MCR further argues that the jury must have found that it was reasonable for the McEwens to want to restore the damaged pond due to the existence of other nearby sources of water.

¶45    The personal reasons analysis aims to ensure that a property owner does not receive a windfall by inquiring into whether the property owner actually intends to use a damage award to restore the property. *Lampi*, ¶ 39. We declined in *Lampi* to adopt "a genuine intent to restore property as a separate element of proof." *Lampi*, ¶ 31. We likewise decline to adopt this separate "objectively reasonable" requirement as a separate element of proof. The personal reasons analysis subsumes both the reasonableness of a plaintiff's use of property and the genuineness of a plaintiff's intent to restore the damaged property. *Lampi*, ¶ 31.

*Commercial Use of Property*

¶46    MCR argues on appeal that we should not extend the type of property use eligible for restoration damages beyond the residential use allowed in *Sunburst* and the recreational use allowed in *Lampi*. We adopted restoration costs as an appropriate measure of damages based on the reasoning of the *Restatement (Second) of Torts § 929* in *Sunburst*. Several weeks later we decided *Shammel v. Canyon Res. Corp.*, 2007 MT 206, 338 Mont. 541, 167 P.3d 886.

¶47    The owners of three commercial family ranching operations alleged claims of trespass, negligence, and nuisance related to contamination of aquifers on their ranch properties from neighboring mining activity. The three ranching families later amended their complaint to allege a constitutional tort pursuant to Montana Constitution, Article II, Section 3, and Article IX, Section 1. We dismissed the constitutional tort based on the fact that the

15

three ranching families "provided no indication that traditional tort remedies, amplified by restoration damages, will not afford them complete redress for the environmental damage." *Shammel*, ¶ 9. Nothing in *Shammel* indicates any concern that restoration damages would be available to the owners of a commercial ranching operation. *Shammel*, ¶ 9.

¶48 The fact that a plaintiff demonstrates a desire to continue to use the damaged property instead of selling it, rather than the particular purpose to which a party puts the property, generally drives the personal reasons analysis. *Sunburst*, ¶ 38. In *G&A Contractors v. Alaska Greenhouses*, 517 P.2d 1379 (Alaska 1974), defendants' rerouting of a creek that crossed plaintiff's land caused extensive damage to trees and ground cover. Plaintiff, a family-owned nursery business, planned to use the damaged property as a showroom for its plants. The court affirmed an award of restoration damages to the plaintiff who wanted to use the damaged land as part of its commercial nursery. *Alaska Greenhouses*, 517 P.2d at 1387; s*ee also Andersen v. Edwards*, 625 P.2d 282, 288 (Alaska 1981).

¶49 The court in *Board of Co. Comm'rs v. Slovek*, 723 P.2d 1309 (Colo. 1986), declined to adopt rigid rules for the type of property use for which an owner may seek restoration damages. The court declared that "[e]ach case must be evaluated under its own circumstances." *Slovek*, 723 P.2d at 1315 fn5. The court in *Roman Catholic Church v. La. Gas*, 618 So. 2d 874, 880 (La. 1993), approved restoration damages for a plaintiff who operated a low-income housing project that Louisiana Gas negligently had damaged through a fire. In *Sunburst* we cited with approval the Louisiana court's conclusion that plaintiff's desire to provide housing to low income families constituted a valid personal reason under

16

the *Restatement (Second) of Torts § 929* to support restoration damages. *Sunburst*, ¶ 35 (citing *Roman Catholic Church*, 618 So. 2d at 880).

¶50     This Court has sought to ensure that an injured property owner does not profit from restoration damages. *Sunburst*, ¶ 40. This focus on a potential windfall ensures that a property owner who recovers an award of restoration damages does not pocket the money instead of using the money to restore the damaged property. The Court's concern with a windfall focuses on the property owner's duty to restore the property. *Lampi*, ¶ 39. This concern with the windfall does not preclude, however, the property owner from earning money through his continued use of the property that he seeks to restore. *Alaska Greenhouses*, 517 P.2d at 1387; *Roman Catholic Church*, 618 So. 2d at 880.

¶51     A property owner who satisfies the personal reasons requirement may seek to recover restoration costs for a commercial family ranch, where the family lives and earns its living, in the same manner that a property owner may recover restoration damages for a personal residence, or for land used for a personal residence and recreation uses. No one rigid rule guides the appropriate measure of damages to real property. We have allowed restoration costs to be awarded in a case involving damages to residences and a school in *Sunburst*, and damages to land used for a residence and for recreation in *Lampi*. We will evaluate each future claim "under its own circumstances." *Slovek*, 723 P.2d at 1315 fn5.

*Objectively Reasonable Damages*

¶52     MCR argues finally that McEwens sought an objectively unreasonable amount of damages. MCR argues that our restoration damages cases allow McEwens to recover restoration damages only if McEwens seek an objectively reasonable amount. MCR

17

correctly notes that a jury cannot award unreasonable damages to McEwens. Section 27-1-302, MCA; *Ehly v. Cady*, 212 Mont. 82, 97, 687 P.2d 687, 695 (1984). MCR confuses, however, the timing of this reasonableness analysis.

¶53 The party presents the jury with evidence regarding the cost to restore his property to its pre-injury condition. The jury determines how much to award, if any, to the damaged property owner. A court may review the jury's damage award to ensure that it qualifies as reasonable and is not so grossly out of proportion to the injury as to shock the conscience. *Kiely Const., L.L.C. v. City of Red Lodge,* 2002 MT 241, ¶ 102, 312 Mont. 52, 57 P.3d 836.

¶54 *Sunburst* assessed on appeal the reasonableness of the amount of restoration damages awarded in response to the tortfeasor's concern of a potential windfall. *Sunburst*, ¶¶ 45-49. We declined to set a strict cap on restoration damages, in part, to avoid any incentive for a potential tortfeasor to undertake a dangerous activity content with the knowledge that the costs of remediating potential harm to neighboring property would be limited. *Sunburst*, ¶ 46. We further recognized that areas with great ecological value may have little or no commercial value. *Sunburst*, ¶ 48.

¶55 A strict cap on damages would deny any meaningful remedy for the harm to areas with limited commercial value. *Sunburst*, ¶ 46. The court in *Com. of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 673 (1st Cir. 1980), refused to limit restoration damages to diminution in value where an oil spill affected an environmentally-sensitive area with an alleged market value of $5,000 per acre. The court in *Nampa & Meridian Irr. Dist. v. Mussell*, 139 Idaho 28, 34, 72 P.3d 868, 874 (Idaho 2003), recognized that the cost of

repairing or restoring an irrigation ditch represented an appropriate measure of damages as the easement had no value other than as a water conveyance.

¶56    The courts' reasoning in *Nampa & Meridian Irr. Dist.*, *SS Zoe Colocotroni*, and the implication derived from *Shammel* resonate here. Rural agricultural land in many regions of Montana has a low commercial value. Testimony at trial pegged the value of the property beneath the contaminated pond between $850 and $2400. McEwens' preferred method to restore the contaminated property would cost $2.2 million. A less costly alternative method could help restore the property. MCR argued that the contaminated property could be restored for $138,000, subject to certain conditions. The District Court instructed the jury to limit damages to "all costs that reasonably would be necessary" to restore McEwens' property to the condition in which it had existed before the contamination. The jury appears to have heeded the court's instruction as it rejected the $2.2 million request for a perfect restoration and instead awarded $310,400, an amount that comports more closely with MCR's proposed restoration alternative of $138,000.

Restoration Damages for Breach of Contract

¶57    McEwens alleged that MCR had damaged McEwens' property either by MCR not properly testing the produced water or by MCR deliberately dumping produced water from sour wells into McEwens' pond. A party generally would frame the claims related to the produced water as either trespass or nuisance. McEwens also had a contract with MCR, however, that allowed MCR to dump some produced water into McEwens' pond.

¶58    MCR could dump this produced water under the contract only if the produced water came from one specific well and only if MCR tested the water every six weeks. McEwens

19

alleged that MCR failed to adhere to both of these contractual terms. As a result, McEwens alleged that MCR's dumping of produced water transformed from acceptable behavior under the contract into a breach of the contract, as well as a trespass and a nuisance. This interplay among the trespass claim, the nuisance claim, and the breach of contract claim, allowed the jury to approve a damage award for any, or all, of the claims. *Sunburst*, ¶¶ 24, 67.

¶59 The jury must have found that the damage to McEwens' property resulted from the breach of contract before the jury could award damages to McEwens for MCR's breach of the contract. *Ehly*, 212 Mont. at 97, 687 P.2d at 695. Two types of contract damages exist. Natural damages represent the direct and natural result of the contract breach. *Ehly*, 212 Mont. at 97, 687 P.2d at 695. Contemplated damages fall within the "contemplation of the parties when they entered into the contract." *Martel Constr. v. State*, 249 Mont. 507, 511, 817 P.2d 677, 679 (1991) (internal citation omitted). Contemplated damages permit recovery for "consequential damages . . . such as might naturally be expected to result from [the contract's] violation." *Martel*, 249 Mont. at 511, 817 P.2d at 679.

¶60 Contemplated damages may be awarded if the parties were aware that the damages would result from a breach of contract. This Court in *Ehly* upheld a damage award for a lost tax investment credit that Ehly anticipated that he would receive when he entered into the contract to purchase land. The defendant breached the contract and Ehly lost his tax investment credit. "Ehly made no secret that a tax savings was one of his objectives in buying the property. The failure of the [defendants] to perform their obligations under the contract . . . was the legal cause of the lost opportunity. . . . These damages were reasonably foreseeable." *Ehly*, 212 Mont. at 97-98, 687 P.2d at 695.

20

¶61    Again in *Stensvad v. Miners & Merchants Bank*, 196 Mont. 193, 640 P.2d 1303 (1982), this Court upheld an award of consequential damages that naturally resulted from the breach of contract. Stensvad had contracted with the bank to borrow money on an ongoing basis to purchase feed for his livestock feed lot. The bank's concern about Stensvad's ability to repay the money prompted the bank to breach its contractual obligation to continue to loan money to Stensvad. The bank also wrongly foreclosed on Stensvad's feed lot and other assets. The bank's wrongful foreclosure forced Stensvad to forfeit money that Stensvad had used to purchase cattle. This Court determined that such damages "were proximately caused by the take-over, and in the ordinary course of things would be likely to result therefrom." *Stensvad*, 196 Mont. at 212-13, 640 P.2d at 1314. This Court upheld this portion of the damage award.

¶62    The terms of the contract help demonstrate whether the parties contemplated that certain damages may result from breach of the contract. *Garden City Floral Co. v. Hunt*, 126 Mont. 537, 255 P.2d 352 (1953). The terms of the contract in *Garden City Floral* demonstrated that the parties had contemplated that breach of the contract could result in the collapse of a building. The contract required the builder to underpin a wall to stabilize it to prevent the wall from collapsing. The builder failed to underpin the wall. The wall collapsed. The collapsed wall caused the entire building to collapse.

¶63    The contractual term that required the wall to be underpinned demonstrated that the parties had contemplated that the wall could collapse if the contract were breached. This Court held that the collapse of the entire building represented the natural result of the

21

collapse of a wall of the building. The contractual terms established that the parties reasonably contemplated this result. *Garden City Floral*, 126 Mont. at 542, 255 P.2d at 355.

¶64 MCR and McEwens' understood that MCR's failure to abide by the terms of the contract could contaminate McEwens' pond. McEwens insisted that MCR test the produced water every six weeks. McEwens instructed MCR to limit the source of the produced water to one specific well. McEwens suspected that produced water from another well previously had killed some of McEwens' sheep. McEwens explained to MCR that these terms were essential to the contract because McEwens believed that produced water could be a threat to their livestock. The inclusion of these terms in the contract reflects the fact that the parties had contemplated potential contamination of McEwens' pond when they entered the contract. *Garden City Floral*, 126 Mont. at 542, 255 P.2d at 355.

¶65 We now must consider whether McEwens' restoration costs qualify as an appropriate measure of consequential damages for a breach of contract claim under these circumstances. Contract damages seek to place a party in the position in which they would have been had the other party not breached the contract. *Textana, Inc. v. Klabzuba Oil & Gas*, 2009 MT 401, ¶ 52, 353 Mont. 442, 222 P.3d 580. This aspiration holds true even if the breach of contract caused damage to property. As this Court recognized in *Bos v. Dolajak*, 167 Mont. 1, 6, 534 P.2d 1258, 1260 (1975), "[w]here damage to property is concerned, the purpose of awarding damages is to return the party injured to the same, or as nearly possible the same, condition as he enjoyed before the injury to his property."

¶66 Damages for breach of contract serve the same purpose as restoration damages: to make the injured party whole, but not to make the injured party better off than they were

22

before the damage occurred. *Bos*, 167 Mont. at 6, 543 P.2d at 1260. To recover restoration damages, a party must show that he has personal reasons for wanting to restore the property. This requirement ensures that the injured party does not keep the money as a windfall, instead of using the damage award to restore the property. *Lampi*, ¶ 39. The same purpose applies to an award for breach of contract. The injured party is "to be made as nearly whole as possible—but not to realize a profit." *Bos*, 167 Mont. at 6, 543 P.2d at 1260.

¶67 Restoration damages also permit an injured party to receive a damage award that exceeds the replacement cost of the damaged property. *Sunburst*, ¶ 46. This Court long has recognized that contract damages may exceed the value of the damaged property. For example, in *Bos* two brothers operated a commercial dairy farm. The brothers contracted with defendants to erect a grain silo. The brothers had planted additional grain in the spring with the expectation of storing their additional grain in their soon-to-be erected grain silo. The defendants' faulty installation caused the grain silo to fail during a windstorm. The jury's damage award included the cost of a new silo and plaintiffs' lost use of the old silo after it had been destroyed. *Bos*, 167 Mont. at 3-4, 543 P.2d at 1259.

¶68 Defendants argued that the costs should have been capped at replacement value of the silo. This Court approved the damage award in excess of the replacement value of the silo. Plaintiffs had personal reasons for the damages in excess of the replacement cost. The silo would serve as an integral part of plaintiffs' dairy farm. Plaintiffs had relied on the silo to store the additional grain that they had planted. Further, the silo was not readily replaceable. *Bos*, 167 Mont. at 8, 543 P.2d at 1261. The damage award in excess of the value of the silo

23

placed plaintiffs in the position they would have been had defendants not breached the contract. *Bos*, 167 Mont. at 10, 543 P.2d at 1262.

¶69 Again in *Chandler v. Madsen*, 197 Mont. 234, 642 P.2d 1028 (1982), this Court approved contract damages in excess of replacement value. Plaintiffs purchased a house from the defendant. Defendant had built the house on moisture sensitive soil. The soil collected water and the house settled. The floors buckled, windows broke, and the fireplace and bathtub separated from the wall. *Chandler*, 197 Mont. at 236-37, 642 P.2d at 1030. The jury's award of damages exceeded the plaintiffs' initial purchase price of the house. *Chandler*, 197 Mont. at 237-38, 642 P.2d at 1030-31.

¶70 Defendant argued that the damages should be capped at the initial purchase price of the house, rather than the cost of restoring the house. Defendant further argued that consequential damages, including temporary rental, moving, and storage costs, should not be granted. This Court noted that men have devised formulas for determining the monetary value of property partially damaged or destroyed. The Court determined that "[w]hile such methods serve as useful guides, the final answer must rest in good sense rather than mechanical application of such formulas." *Chandler*, 197 Mont. at 242-43, 642 P.2d at 1033. The goal of compensating fully the injured plaintiffs for their repair costs justified the damage award that exceeded the replacement cost of the house. *Chandler*, 197 Mont. at 244, 642 P.2d at 1034.

¶71 In contract, as in tort, diminution in value may not always correspond with the extent of the plaintiff's injury. When a plaintiff seeks to continue to use the damaged property instead of selling it, diminution in value may not compensate the plaintiff adequately.

24

*Sunburst*, ¶ 38. If the costs of restoration exceed the fair market value of the property, the plaintiff will be forced either to sell property he wishes to keep, or to make the repairs with his own money. *Sunburst*, ¶ 35. The option of restoration damages may compensate fully a property owner when diminution in value fails to provide an adequate remedy. *Sunburst*, ¶ 33.

¶72 MCR argues that restoration damages for breach of contract claims should not be available automatically to plaintiffs when the costs to restore the property to its previous condition disproportionately exceeds the diminution in value of the property. Rather, MCR argues, plaintiffs should have to demonstrate they have a temporary injury and personal reasons before they become eligible to seek restoration damages in excess of the property value. We agree. Both contract and tort damages restrict recovery to prevent the party from receiving a windfall. *Bos*, 167 Mont. at 6, 543 P.2d at 1260. To require a party with a breach of contract claim that caused damage to property to demonstrate that he intends to use the damage award to restore the damaged property will prevent the party from receiving a potential windfall. *Lampi*, ¶ 39. Similarly, requiring the party to demonstrate that the damaged property can be restored substantially to its earlier condition will help to ensure that the party will use the damage award to restore the property. *Lampi*, ¶ 32; *Burley*, ¶ 98.

¶73 McEwens presented evidence to the jury that satisfied the criteria to receive the cost of restoring their contaminated property as the measure of their damages for their breach of contract claim. The fact that the parties contemplated this type of injury from a breach of contract by MCR, as evidenced by the inclusion of the contractual requirement that MCR test the produced water and that MCR dump produced water only from an approved well,

further buttresses this conclusion. The fact that these damages arose from MCR's breach of the contract between the parties, as opposed to a tort, changes nothing with regard to the outcome.

¶74 *Issue Three. Whether the District Court properly admitted evidence at trial that MCR had jumped McEwens' bid on state trust land leases.*

¶75 McEwens and their predecessor leased four parcels of state trust land for ten-year terms. MCR bid on these four parcels of land in 2009, during the time of the disagreement between McEwens and MCR over the natural gas compressor station and MCR's disposal of the produced water. MCR's bid forced McEwens to pay double in order to retain the lease. The District Court permitted McEwens to introduce evidence of MCR's attempt to jump their lease on state trust land as part of McEwens' case for punitive damages against MCR.

¶76 MCR had no apparent use for the state trust land at issue. MCR had not previously ranched or raised livestock. MCR has not ranched or raised livestock since it submitted the bid on the state trust land. Two of the four parcels on which MCR bid were landlocked by McEwens' property and would have been inaccessible to MCR. MCR argued at trial that it had bid on the leases because MCR had entered into a buy/sell agreement on ranch property that borders McEwens' property. MCR admitted, however, that MCR intended to continue leasing MCR's new property to the current leasee, and had no plans to ranch this new land themselves. MCR also admitted that the current leasee had not expressed any interest in leasing these four tracts of state trust land. McEwens alleged that MCR bid on this land solely to raise the lease price paid by McEwens. MCR's bid forced McEwens to pay almost twice as much as they had been paying to return the lease.

26

¶77    MCR contends that the District Court abused its discretion by admitting this evidence because MCR's bid on the state trust land was irrelevant to the claims at trial. MCR points out that evidence that MCR bid on the state trust land did not make it more or less likely that MCR had trespassed on McEwens' property, or had caused a nuisance on McEwens' property, or had breached a contract with McEwens. We agree with MCR that evidence of MCR's bid is irrelevant to these claims. This evidence relates, however, to McEwens' claim for punitive damages. MCR argues that evidence cannot be admitted solely to prove a punitive damages claim. MCR contends that evidence must be admissible to prove one of McEwens' other claims in order for the court to have admitted the evidence for purposes of proving McEwens' punitive damages claim. We disagree.

¶78    Evidence collateral to all other issues in the case nevertheless may be admissible to prove punitive damages. The district court in *Cooper v. Rosston*, 232 Mont. 186, 756 P.2d 1125 (1988), excluded evidence of how a driver had reacted immediately after a car accident. The driver claimed that someone else had been driving and he failed to mention that he had been drinking alcohol before the accident until it was too late for investigating authorities to conduct a blood alcohol test. *Cooper*, 232 Mont. at 190, 756 P.2d at 1127. This Court determined that the district court had abused its discretion by excluding this evidence. The evidence related to plaintiff's claim for punitive damages even though it may not have been relevant to any of the other claims in the case. *Cooper*, 232 Mont. at 190, 193, 756 P.2d at 1128, 1129.

¶79    In *Runkle v. Burlington N.*, 188 Mont. 286, 613 P.2d 982 (1980), a freight train collided with a vehicle in Troy, Montana, and killed its driver. The decedent's wife sought

27

punitive damages on the basis that the railroad company had acted wantonly in placing profits ahead of safety considerations. The city council had considered lowering the speed limit on that stretch of railroad from 40 miles per hour to 25 miles per hour. The trial court excluded as irrelevant proposed testimony from a city council member that the railroad had pressured him to vote to maintain the 40 miles per hour speed limit. This Court reversed on the grounds that the excluded evidence potentially could have demonstrated the railroad's wantonness in support of plaintiff's claim for punitive damages. *Runkle*, 188 Mont. at 301, 613 P.2d at 991.

¶80 We agree with McEwens that evidence of MCR's decision to bid on the state trust land falls within the broad scope of relevancy as this evidence made it more probable that MCR had acted maliciously towards McEwens. M. R. Evid. 401. Evidence of MCR's decision to bid on the state trust land, for which it had no discernible use, demonstrated that MCR had been acting deliberately in a way that had a high probability of injuring McEwens. Section 27-1-221, MCA. A court may admit evidence relevant to a punitive damages claim even if the evidence supports no other claim. *Runkle*, 188 Mont. at 301, 613 P.2d at 991; *Cooper*, 232 Mont. at 193, 756 P.2d at 1129. We cannot say that the District Court acted arbitrarily without conscientious judgment when it admitted this evidence. *McCormack*, ¶ 22.

¶81 As a final note, we recognized in *Malcolm v. Evenflo Co.*, 2009 MT 285, 352 Mont. 325, 217 P.3d 514, that our system provides for the presentation of evidence regarding liability for compensatory damages and punitive damages to the jury in a single proceeding. *Evenflo*, ¶ 103; *Finstad v. W.R. Grace & Co.*, 2002 MT 228, ¶ 20, 301 Mont. 240, 8 P.3d

28

778. We previously have considered whether evidence relevant only to the question of punitive damages should be admitted in a separate hearing to prevent a jury from incorrectly considering this evidence in relation to the issue of compensatory damages. *Sunburst*, ¶ 86; *Evenflo*, ¶ 103. MCR argued on appeal, however, only that the evidence of its attempt to jump McEwens' state lease was not relevant to McEwens' claim for punitive damages. MCR did not argue to the District Court, and did not argue on appeal, that the District Court should have bifurcated the compensatory damages and punitive damages proceedings. As a result, we do not need to resolve this issue.

## CONCLUSION

¶82 The District Court properly allowed McEwens to pursue restoration costs as an appropriate measure of damages to their property. The court properly admitted evidence that MCR had attempted to jump McEwens' lease on state trust land. This evidence related to McEwens' claim for punitive damages. We remand to the District Court for resolution of MCR-T's claim for condemnation of McEwens' property for its compressor station.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE

Justice James C. Nelson, specially concurring.

29

¶83     I concur in the Court's decision as to Issues One and Three. I also concur in the result of the Court's Opinion as to Issue Two (concerning restoration costs) and most of the Court's analysis under that issue. I disagree, however, with the premise upon which the Court's harmless-error analysis is based. Specifically, I do not agree that the District Court erred in ruling, as a matter of law, that restoration costs are the appropriate measure of damages. I explain my reasoning in Part I below. Additionally, given the Court's clarifications to the analysis of restoration costs at ¶¶ 28-31 of the Opinion, I suggest that certain procedures should be followed in these sorts of cases. I discuss those procedures in Part II below.

## I. Harmless-Error Analysis

¶84     The Court commences its harmless-error analysis by agreeing with MCR's argument that the question whether McEwens presented sufficient personal reasons for seeking to restore their property presents a question of fact for the jury to decide. Opinion, ¶ 34 (citing *Lampi v. Speed*, 2011 MT 231, ¶ 48, 362 Mont. 122, 261 P.3d 1000). I believe this misstates—or at least overstates—what we actually held in that portion of the *Lampi* opinion. In fact, I initially wrote separately in *Lampi* based, in part, on this exact issue—i.e., whether the measure of damages is a question of law or a question of fact. In deciding to withdraw my separate concurring and dissenting opinion and sign the Court's decision, I understood our holding to be merely this: the cost of restoring property to its pre-injury condition generally constitutes the appropriate measure of damages for temporary injuries, *Lampi*, ¶ 24, and the trial court should rule pretrial, as a matter of law, that restoration cost is the applicable measure of damages, unless the record reflects a genuine issue of material fact

30

concerning the temporary nature of the injury or the plaintiff's personal reasons for wanting to restore the property to its original condition, *Lampi*, ¶¶ 44-48. Those are the "issues" we were referring to as "factual questions" at ¶ 48 of *Lampi*.

¶85 Innumerable cases hold that the choice of the proper measure of damages is a question of law for the court, while the calculation of the amount of damages is a question of fact for the fact-finder. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); *S. Colo. MRI, Ltd. v. Med-Alliance, Inc.*, 166 F.3d 1094, 1100 (10th Cir. 1999); *Elkins v. Dist. of Columbia*, 527 F. Supp. 2d 36, 46 (D.D.C. 2007); *Hendricks v. DSW Shoe Warehouse, Inc.*, 444 F. Supp. 2d 775, 779 (W.D. Mich. 2006); *R&B Holding Co. v. Christopher Advert. Group, Inc.*, 994 So. 2d 329, 331 (Fla. 3d Dist. App. 2008); *Basic Am., Inc. v. Shatila*, 992 P.2d 175, 194 (Idaho 1999); *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 409 (Ill. 2006); *Gee v. Payne*, 939 S.W.2d 383, 385 (Mo. App. W. Dist. 1997); *Connelly v. City of Omaha*, 816 N.W.2d 742, 753 (Neb. 2012); *Matthews v. Davis*, 664 S.E.2d 16, 21 (N.C. App. 2008); *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. App. Middle Sec. 1998); *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999); *Merchant v. Peterson*, 690 P.2d 1192, 1195 n. 1 (Wash. App. Div. 3 1984); *Magestro v. N. Star Envtl. Const.*, 649 N.W.2d 722, 725 (Wis. App. Dist. 2 2002).

¶86 Given this wealth of precedent, the District Court was *not* wrong in rendering a decision that McEwens were entitled to restoration costs as a matter of law. Under the foregoing authorities, the District Court—not the jury—was the proper entity to make this ultimate determination. Indeed, while the Court implies that the District Court got it wrong because it did not have the benefit of our decision in *Lampi* (Opinion, ¶ 34), the truth is that

31

the District Court, in deciding this issue, cited the following statement by this Court in an opinion handed down *prior* to *Lampi*: "Whether restoration damages may be awarded in excess of a property's market value constitutes *a question of law*." *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 28, 338 Mont. 259, 165 P.3d 1079 (emphasis added). The District Court did not err; it simply followed the law as stated in *Sunburst* and the myriad cases cited above.

¶87 The parties raised this issue (i.e., whether the appropriate measure of damages was diminution value or restoration cost) in their cross-motions for summary judgment. I see nothing inappropriate in seeking a pretrial determination of this issue. In fact, doing so is a sensible approach. The temporary nature of McEwens' injury was conceded, but the question whether they had personal reasons to restore the property was in dispute. The District Court thus deferred ruling on the proper measure of damages "until all the facts are presented regarding the parties and the injuries." I see no error in this approach either. Ultimately, on the third day of trial, the District Court granted McEwens' motion for summary judgment, ruling that restoration costs were the appropriate measure of damages. Again, I see no error in this approach. The inference readily drawn from the District Court's ruling[1] is that the court determined there were no genuine issues of material fact concerning the applicability of restoration costs, and McEwens were entitled to judgment as a matter of law on this issue. M. R. Civ. P. 56(c). There is, accordingly, no reason for this Court to

---

[1] We may draw such inferences. *State v. Ditton*, 2006 MT 235, ¶ 23, 333 Mont. 483, 144 P.3d 783.

characterize the District Court's decision as "error" and then to embark on an analysis of whether that "error" was harmless. Opinion, ¶¶ 35-42.

## II. Suggested Approach

¶88 *Restatement (Second) of Torts* § 929 (1979) states, in pertinent part:

> (1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
> (a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred . . . .

This language makes clear that the plaintiff may elect diminution value or, in an appropriate case, restoration cost.

¶89 As to the latter, Comment b provides further details. First, it states:

> *Even in the absence of value arising from personal use*, the reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery. Thus if a ditch is wrongfully dug upon the land of another, the other normally is entitled to damages measured by the expense of filling the ditch, if he wishes it filled.

*Restatement (Second) of Torts* § 929 cmt. b (emphasis added). This language indicates that restoration cost ordinarily is allowed *even without personal reasons for wanting to restore the property*. If the plaintiff wishes to have the property restored, she is normally entitled to that remedy.

¶90 Second, subsequent to the foregoing quoted language, Comment b then states:

> If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm. This would be true, for example, if in trying the effect of explosives, a person were to create large pits upon the

33

comparatively worthless land of another. On the other hand, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building.

*Restatement (Second) of Torts* § 929 cmt. b (paragraph break omitted). This language indicates that if the restoration cost is disproportionate to the diminution value, then damages are limited to diminution value, unless the plaintiff shows personal reasons for restoring the original condition of the property. The "personal reasons" element is triggered by a threshold determination of "disproportionality."

¶91    Accordingly, there are two distinct facets to the availability of restoration costs. First, restoration costs are available only if the damaged property is capable of being restored. Opinion, ¶ 31. If the injury is permanent, and restoration is impossible, then restoration costs are not an appropriate measure of damages. Hence, a showing that the injury is "temporary" is necessary in *all* cases where restoration costs are sought. Opinion, ¶ 30. If the injury is temporary, then restoration costs ordinarily are allowed. *Restatement (Second) of Torts* § 929 cmt. b.

¶92    Second, a showing of "personal reasons" is *not* necessary in *all* cases. The rule states that the plaintiff must show personal reasons only where the cost of replacing the land in its original condition is "disproportionate" to the diminution in the value of the land. Opinion, ¶ 31; *see e.g. Osborne v. Hurst*, 947 P.2d 1356, 1360 (Alaska 1997) ("Under the foregoing principles [of § 929], Osborne and Christensen were entitled to elect as their preferred measure of damages restoration costs instead of diminished market value; *but if restoration costs were disproportionate in relation to the diminution in market value, Osborne and*

34

*Christensen were further required to prove the existence of a case-specific justification, or 'reason personal' for their chosen measure of damages*." (emphasis added)). Presumably, once a plaintiff indicates that she intends at trial to seek restoration costs, the defendant may assert that such costs are disproportionate to diminution value. If the defendant prevails on the disproportionality issue, then restoration costs are unavailable and the plaintiff is limited to diminution value as the measure of damages, unless the plaintiff can show personal reasons for restoring the original condition of the property. On the other hand, if the defendant does *not* prevail on the disproportionality issue, then restoration costs are allowable, without a showing of personal reasons. *Restatement (Second) of Torts* § 929 cmt. b.

¶93    I note that the "personal reasons" factor aims to ensure that a property owner does not receive a windfall. Opinion, ¶¶ 45, 50, 66, 72. Concerns over a potential "windfall" are implicated precisely because "the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass." *Restatement (Second) of Torts* § 929 cmt. b. Comment b requires a showing of "a reason personal to the owner for restoring the original condition" when such disproportionality exists. Absent disproportionality, there is no risk of a "windfall" in requiring the defendant to pay restoration costs—e.g., to fill in a ditch that the defendant wrongfully dug upon the plaintiff's land. There is no reason in such situations to require the plaintiff, who seeks restoration costs, to show anything other than that the injury is temporary.[2]

---

[2] Of course, if it is determined that restoration cost is the appropriate measure of damages, I do not believe that diminution value has any further relevance to the analysis.

¶94    Given this framework, the potential factual issues underlying the applicability of restoration costs as the measure of damages are:  (1) whether the injury is permanent or temporary; (2) whether the restoration cost is disproportionate to the diminution value; and (3) if the restoration cost is disproportionate to the diminution value, whether the plaintiff has a personal reason for restoring the land in its original condition.  In an effort to reconcile the rule of § 929 with the legal principle that the choice of the proper measure of damages is a question of law for the court, I suggest that the following scenarios and procedures should be followed.

¶95    First, where the plaintiff elects restoration cost and the defendant does not contest this election, the trial court may rule pretrial that restoration cost is the applicable measure of damages and instruct the jury accordingly.

¶96    Second, where the plaintiff elects restoration cost and the defendant contests this election, but the defendant fails to identify a genuine issue of material fact as to any of the three factual matters identified above, the trial court may rule as a matter of law that

---

Indeed, allowing the jury to factor diminution value into its calculation of the amount of restoration costs would effectively sabotage the plaintiff's right to elect restoration costs. These two measures of damages—restoration versus diminution—are entirely distinct, and the diminution in market value has no bearing on the amount needed to restore the property to its original condition. *Heninger v. Dunn*, 162 Cal. Rptr. 104, 108 (Cal. App. 1st Dist. 1980).  Indeed, in some cases, the defendant's wrongful act may have actually *increased* the property's market value, and yet the plaintiff still may be entitled to have the property restored to its original condition. *See e.g. Heninger*, 162 Cal. Rptr. 104.  In any event, once the plaintiff overcomes any disproportionality problem—either because the restoration cost is not disproportionate to the diminution value, or because the plaintiff has shown personal reasons for restoring the property's original condition—then diminution value falls out of the equation.

restoration cost is the applicable measure of damages and instruct the jury accordingly. That is effectively what occurred in the present case.

¶97     Third, where the plaintiff elects restoration cost and the defendant contests this election, and the defendant identifies a genuine issue of material fact as to any of the three factual matters identified above, the trial court should instruct the jury to resolve those factual matters and then, depending on that resolution, to apply either restoration cost or diminution value. Thus, the jury should be instructed that if it resolves the factual issue(s) relating to (1) temporary injury, (2) disproportionality, and/or (3) personal reasons in favor of the plaintiff, then it should apply restoration cost as the measure of damages, but that if it resolves the factual issue(s) relating to these elements in favor of the defendant, then it should apply diminution value as the measure of damages.

¶98     The critical point of this approach is that the proper measure of damages is a question of law for the court, but whether a particular measure of damages is proper may depend on the existence of certain facts—as is the case with restoration costs. And when there is a genuine issue of material fact as to the existence of any of those predicate facts, then a fact-finder necessarily must become involved to resolve the dispute. Contrary to MCR's argument, this does not mean that the applicable measure of damages thereby becomes a "question of fact." Opinion, ¶ 34. The fact-finder merely resolves any genuine factual disputes that the trial court has determined exist with respect to any of the factual predicates. The trial court still instructs the jury what the appropriate measure of damages is, based on two alternative outcomes: if the jury resolves the factual dispute(s) in the plaintiff's favor, then restoration cost is the applicable measure of damages, and the jury should calculate the

37

damages accordingly, but if the jury resolves the factual dispute(s) in the defendant's favor, then diminution value is the applicable measure of damages, and the jury should calculate the damages accordingly.

¶99 Of course, to ensure that the calculations are done properly, the trial court must carefully instruct the jury as to the method of calculating damages, depending on which measure applies (restoration versus diminution). Where, as in the third scenario above, both forms of damages are possible depending on the jury's resolution of factual disputes, the trial court must carefully instruct the jury to apply the restoration method if the facts are resolved in the plaintiff's favor, and the diminution method if the facts are resolved in the defendant's favor. The court should require a special verdict to make it clear which sort of damages the jury is awarding and the amount thereof.

¶100 I would adopt the foregoing procedures where the plaintiff seeks restoration costs. As for the present case, I believe it falls into the second scenario identified above. The District Court resolved the issue of the appropriate measure of damages on summary judgment—albeit, within the midst of trial—and applying de novo review to that ruling (Opinion, ¶ 15), I perceive no error. MCR did not demonstrate with substantial evidence that there were any genuine issues of material fact regarding McEwens' personal reasons for wanting to restore their property. *Hinderman v. Krivor*, 2010 MT 230, ¶ 13, 358 Mont. 111, 244 P.3d 306. I would affirm the District Court on this basis, rather than the Court's "harmless error" approach. Opinion, ¶¶ 35-42.

¶101 With the foregoing caveats, I concur in the Court's decision.

/S/ JAMES C. NELSON


Justice Patricia O. Cotter joins the Special Concurrence of Justice James C. Nelson.


/S/ PATRICIA COTTER